[Crim. No. 204. Fourth Appellate District.—May 27, 1931.]

THE PEOPLE, Respondent, v. TSUJI HORIUCHI et al.,
Appellants.

R. W. Henderson, Leo Gallagher and Alfred Blaisdell for Appellants.

U. S. Webb, Attorney-General, James S. Howie, Deputy Attorney-General, Elmer Heald, District Attorney, and C. B. Smith, Deputy District Attorney, for Respondent.

LAMBERSON, J., *pro tem.*—The defendants, numbering seven, were jointly accused by an indictment presented against them by the grand jury of Imperial County of various offenses alleged to have been committed in violation of provisions of the Criminal Syndicalism Act (Stats. 1919, p. 281). The indictment contains three separate counts, the first of which attempts to charge a violation of subdivision 4 of section 2 of the act. The second count is framed with the purpose of charging violations of subdivisions 1, 2 and 3 of said act; and the third count is designed to charge a conspiracy to accomplish a change in existing economic and social systems and to effect political changes by means and methods denounced by the act.

The defendants were tried jointly and a verdict of guilty as charged in each count of the indictment was returned by the jury. Motions for a new trial were made by the defendants and were denied. From the judgments of conviction and the orders denying the defendants' motion for a new trial this appeal is taken.

Demurrers were filed by the defendants to each of the counts of the indictment and each of them was overruled.

In the first count it was alleged that on or about the fourteenth day of April, 1930, each of the defendants "did then and there willfully, unlawfully and feloniously organize and assist in organizing and knowingly became and were members of an organization, society, group and assemblage of persons known and designated as the 'Communist Party', and its affiliated orders known as the 'Trade Union Unity League', hereinafter referred to as the 'T. U. U. L.' and the 'Agricultural Workers Industrial League', hereinafter referred to as the 'A. W. I. L.' and the 'Red International of Labor Unions' hereinafter referred to as the 'R. I. L. U.', *were* then and there organized for the purpose of defending, advocating, teaching, and abetting criminal syndicalism, sabotage, violence and unlawful means of terrorism, and other unlawful methods as a means of accomplishing a change in industrial ownership and control and effecting political changes, . . ."

At the beginning of the trial permission was given to the prosecution to amend the indictment by changing the word "were" after the initials "R. I. L. U." to "was", but no other change was requested or made. The amendment was permissible (Pen. Code, sec. 1003), but it did not serve to clarify the language of the indictment.

Among other grounds of demurrer appellants urge that count one as framed is so ambiguous and unintelligible that it did not sufficiently inform the defendants of the offense with which they were charged or to enable them to plead any judgment in bar of further prosecution and that it is so duplicitous and unintelligible that the prosecution of the defendants upon such count would operate to deprive them of their liberty without due process of law, in violation of the first section of the fourteenth amendment to the Constitution of the United States.

We are of the opinion that the demurrer to the first count of the indictment should have been sustained. An analysis of the allegations of that count indicates that the charge is that each of the defendants organized and knowingly became members of an organization, society, group and assemblage of persons known as the "Communist Party" and its affiliated orders known under various names; that such organization or organizations was or were organized for certain purposes named in subdivision 4 of

section 2 of the Syndicalism Act. So far as the indictment follows the language of the statute the pleading is proper and the numerous authorities cited by respondent are in point (*People* v. *McClennegen*, 195 Cal. 445), but the pleader has endeavored to bring into the indictment not only the "Communist Party", but also certain affiliated organizations, without attempting to allege an identity of purpose or of interests.

The grammatical structure of the indictment does not permit us to conclude that the purpose of the grand jury was to isolate and single out the group assembled under the denomination of "Communist Party" as the only group under attack or that the other organizations were named only parenthetically as was done in the case of *People* v. *Steelik*, 187 Cal. 361 [203 Pac. 78], and other cases.

The language and construction of the first count of the indictment is grammatically defective and the defect is so serious that it is impossible to say that the count contains a definite and certain statement of the offense charged. ■ Such statement must be in ordinary and concise language and made in such manner as to enable a person of ordinary understanding to know what was intended. But above all other things, the charge must be so certain that a court would be enabled to pronounce judgment upon conviction, and the defendant in the event of either an acquittal or conviction could not be again tried for the same offense. The pleading must be such as to enable a defendant to plead his jeopardy against further prosecution. (*People* v. *Steelik, supra; People* v. *Malley*, 49 Cal. App. 597 [194 Pac. 48].)

The severest test of the first count is found in the question whether or not the defendants or either of them could plead former jeopardy if either one of them should be charged with the offense of being a member of one of the alleged "affiliated" organizations. ■ The word "affiliated" signifies a condition of being united, being in close connection, allied, or attached as a member or branch, but it does not bear the construction that one of the "affiliated" organizations is in all particulars identical with or covered by the parent, or main organization with which it is said to be affiliated. Indeed the evidence in the instant case demonstrates that the

organizations named in the indictment had a variety of objectives, differing in scope, but looking up to the Communist Party as the parent organization. The objectives and purposes for which either one or all of the organizations was formed were in all likelihood subject to the inhibitions of the act under which the indictment was drawn. This fact operates to impress upon us more strongly the principle that the indictment should be clear and unequivocal, as well as concise in its allegations. The defect in the present indictment could have easily been cured by the use of words which would have made positive and clear that membership in the Communist Party was the only subject of attack.

While the organizations named in the indictment have apparently many things in common and one may be the branch of another, the evidence indicates that they were not identical. Apparently the "Communist Party" had a more restricted membership than the "Agricultural Workers Industrial League" or the "Trade Union Unity League". Comparatively little appears in the evidence as to the "Red International of Labor Unions". Therefore to say that a person is a member of one of the minor organizations named in the indictment is not to say that he is a member of the "Communist Party", although he might be very much in sympathy with its teachings. ▮ The vice of the first count of the indictment is illustrated in the case of the appellant Danny Roxas. An examination of the testimony indicates that he made two applications for membership in the Communist Party, but there was no record of acceptance of either application on the part of the organization. The evidence is plain that he was an active worker in the cause of the other organizations as well as the Communist Party, and having assumed to allege membership in a certain organization the burden of proof was upon the prosecution to establish such membership, but this burden was not sustained by proof that he was a member of one or the other of the subordinate organizations.

Section 4½ of article VI of the California Constitution provides that no judgment shall be set aside or new trial granted in any case on the ground of misdirection of the jury, or of the improper admission or rejection of evi-

dence, or for any error as to any matter of pleading or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.

 It is fundamental that due process of law requires adherence to the established principles of criminal procedure. One of these principles is that the indictment must be so clear and direct in its charges that the defendant may be enabled to properly defend himself if again placed in jeopardy. In the case of *People* v. *O'Bryan,* 165 Cal. 55, at page 65 [130 Pac. 1042, 1046], the Supreme Court said:

"Section 4½ of article VI of our Constitution must be given at least the effect of abrogating the old rule that prejudice is presumed from any error of law. Where error is shown it is the duty of the court to examine the evidence and ascertain from such examination whether the error did or did not in fact work an injury. . . ."

"On the other hand, we do not understand that the amendment in question was designed to repeal or abrogate the guaranties accorded persons accused of crime by other parts of the same Constitution or to overthrow all statutory rules of procedure and evidence in criminal cases. Where we speak of administering 'justice' in criminal cases, under the English or American system of procedure, we mean something more than merely ascertaining whether an accused is guilty or not guilty. It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected."

 In the present case the language of the first count is both ungrammatical and equivocal and in order to give it definite meaning this court would be compelled to place one construction upon it in the face of the fact that the language of the indictment would just as easily bear another construction. This court is not permitted to take such liberties with the pleading under consideration. Nor does the fact that the prosecuting attorney announced in his opening statement before the jury at the outset of the case that the organization against which the indictment was directed was the Communist Party avail to throw about the defendants the protection of their rights guaranteed by the

Constitution. Unlike the situation in the case of *People* v. *Taylor*, 187 Cal. 378 [203 Pac. 85], evidence in considerable volume was introduced for the purpose of showing the activities of the defendants in the various organizations named in the indictment other than the Communist Party.

The demurrer to the second count of the information was upon the ground that the count charges the defendants with the commission of numerous offenses, the number of which could not be ascertained because of the ambiguity of the language in which the count is expressed; that it is so ambiguous and unintelligible that it does not sufficiently inform the defendants of the offense with which they are charged to enable them to prepare for trial or to plead any judgment thereon in bar of further prosecution and the effect of a prosecution thereon is to deprive them of their liberty without due process of law.

While the second count is lengthy, it seems necessary for a proper understanding of the matter to quote the major portion thereof.

The charging part reads as follows: ''That the said defendants, and each of them, at and in the County of Imperial, State of California, within three years last past, and on or about the 14th day of April, 1930, and before the finding of this indictment, did then and there willfully, unlawfully, and feloniously, by spoken and written words and personal conduct advocate, teach, aid and abet criminal syndicalism and the duty, necessity and propriety of committing crime, sabotage, violence, and unlawful methods of terrorism as a means of accomplishing a change in industrial ownership and control and effecting political changes, and did then and there willfully, unlawfully, feloniously and deliberately by spoken and written words, justify and attempt to justify criminal syndicalism and the commission and attempt to commit crime, sabotage, violence and unlawful methods of terrorism, with intent to approve, advocate and further the doctrine of criminal syndicalism, as a means of accomplishing a change in industrial ownership and control and effecting political changes; and did then and there willfully, unlawfully and feloniously publish, issue, circulate, and publicly display certain books, papers, pamphlets, documents, posters, and written and printed matter in other forms containing and

·carrying written and printed advocacy of teaching and aid and abetment of, and advising criminal syndicalism, to-wit, 'by spoken words and personal conduct advocating terrorism and advising the commission of crime, sabotage and other willful and malicious damage and injury to property and particularly advocating the overthrow of the United States Government by means of force and violence, and advocating unlawful destruction of cantaloupe shipping sheds in Imperial County, cantaloupe crops and railroad property in Imperial County, and by advocating unlawful picketing of sheds and fields in Imperial County, and by advocating personal violence to all peace officers, militia and all other law enforcement officers and persons who might attempt to intercede against them and other unlawful acts of force and violence and unlawful methods of terrorism as a means of accomplishing a change in industrial ownership and control or to effect political changes. That the names and descriptions of the written and printed books, papers, documents, posters and written and printed matter in other forms, which advocated, taught, or aided and abetted criminal syndicalism, or the duty, necessity or propriety of committing crime, sabotage, violence or any unlawful method of terrorism, as a means of accomplishing a change in industrial ownership or control or effect any political change, or which willfully and deliberately justified or attempted to justify criminal syndicalism or the commission or attempt to commit crime, sabotage, violence or unlawful methods of terrorism with intent to approve, advocate, or further the doctrine of criminal syndicalism, or which were printed, published, edited, issued or circulated or publicly displayed, containing or carrying written or printed advocacy teaching, or aid and abetment of or advising criminal syndicalism, are as follows, to-wit:''

(Here follows an itemized list of 27 booklets, pamphlets, leaflets, newspapers and circulars which attempts to give the title, number of pages contained in each and sometimes the date of publication.)

The second count attempts to follow, in substance, the language of subdivisions 1, 2 and 3, of section 2 of the Syndicalism Act. While it is subject to considerable criticism, we are of the opinion that the meaning is plain and intelligible. No objection is made by the appellants, ex-

cepting Frank Spector, that the evidence is insufficient to support the verdict of the jury. Although the list of pamphlets, etc. is not connected with the first part of the indictment by reason of the grammatical structure adopted and the punctuation is faulty, still it is plain that the list refers back to that portion of the indictment which charges that the defendants did unlawfully publish certain books, papers, etc. We do not commend the form of pleading adopted but are satisfied, after a review of the evidence, that the result comes within the purview of section 4½ of article VI of our state Constitution, and that the demurrer was properly overruled.

In answer to the objection that the count is duplicitious, it may be said that when a statute enumerates a series of acts, either of which separately or all together may constitute the offense, all of such acts may be charged in a single count, for the reason that notwithstanding each act may, by itself, constitute the offense, all of them together do no more and likewise constitute but one and the same offense. (*People* v. *McClennegen, supra,* and cases cited therein.)

Subdivisions 1, 2 and 3 treat of allied subjects and in some respects their phrasing is tautological and redundant. It would confuse the most expert pleader to attempt to incorporate all of the offenses chargeable thereunder in one count without some repetition of expression. The gist of the count is that the defendants by spoken and written word advocate a certain course of action condemned by law and the written words are those contained in the various pieces of printed matter described in the count.

It is obvious from the record, over 5,000 typewritten pages of which is devoted to copies of the pamphlets and other printed matter received in evidence, that the printed matter included in the booklets and other publications listed in the indictment is too voluminous to have been incorporated even piecemeal in the indictment. The references contained in the indictment are sufficient to identify them. (*People* v. *Malley, supra.*)

The third count of the indictment reads in part as follows: "That the said defendants and each of them at and in the county of Imperial, state of California, within three years last past, and on or about the fourteenth day of

April, 1930, and before the finding of this indictment, and the members of said Communist Party and its affiliated orders, to-wit, the Trade Union Unity League, also known as the T. U. U. L. and the Agricultural Workers Industrial League, also known as the A. W. I. L. and the Red International of Labor Union, also known as the R. I. L. U. by joining and becoming members of said organization, agreed to enter into and did enter into a conspiracy, scheme, plan and agreement to bring about a change of industrial ownership and control and effecting political changes in the county of Imperial, state of California and the United States of America, and, as a part of said conspiracy, scheme and plan, to use force and violence and unlawful methods, sabotage, strikes and boycotts to bring about such changes, and as a part of such plan, scheme and agreement to teach, advocate the overthrow of the United States Government and unlawful use of force and violence and the unlawful destruction of property and unlawful picketing of sheds and fields in Imperial county, aid and abet, commit and attempt to commit criminal syndicalism, sabotage, violence, unlawful methods of terrorism, strikes and boycotts, as a means of accomplishing a change in industrial ownership and control and effecting political changes, by the personal act and conduct, said organization, its members, and the defendants herein, did print, publish, edit, issue, distribute and circulate and publicly display books, papers, pamphlets, documents, posters and other written and printed matter, to-wit: 1. A booklet entitled 'Why each Worker Should Join the Communist Party', containing 31 pages. . . . ''

(Here follows a list of 26 other booklets, etc., referring sometimes to dates of publication and the numbers of the pages.)

''And other leaflets and publications, published and edited by the said organizations, its members, and the defendants herein, caused to be printed, distributed, circulated, and did print, teach, distribute and circulate and publicly display in the county of Imperial, state of California, the books, papers, pamphlets and leaflets described above.

''All of which conduct on the part of said organization, its members and the defendants herein named, advised,

advocated, aided and abetted the doctrine and precepts of criminal syndicalism with the intent to accomplish a change in industrial ownership and control, and effecting political changes, . . ."

 This count of the indictment is objectionable upon the same grounds as heretofore stated in our discussion of the first count. The indictment does not state the charge against the defendants in ordinary or concise language, or in such manner as to enable a person of common understanding to know what was intended. The language of the count is involved and unintelligible. We are of the opinion that the demurrer should have been sustained and that the error is not cured by the provisions of section 4½ of article VI of the Constitution.

 The motion for a new trial made on behalf of the defendant Frank Spector after conviction on each count of the indictment should have been granted. It is conceded by respondent that there is no evidence in the record that this appellant was ever in Imperial County prior to the date of the indictment and that therefore the jury should have acquitted him on count two. The same result should have been reached as to count one and count three. The evidence is insufficient to sustain the verdict. The only evidence in regard to his activities is to the effect that at a meeting of the Trade Union Unity League held in the city of Los Angeles, and to attend which some of the other appellants and an operative employed by the district attorney of Imperial County traveled from that county to Los Angeles, the appellant Spector made a speech in which he stated that he was the representative of an organization known as International Labor Defense; that court proceedings were coming up, that the Trade Union Unity League was getting workers out of jail who were arrested for labor activities and it was the duty of the International Labor Defense to take care of the court proceedings. On another occasion he stated, according to the testimony, that the same organization would he prepared to give bail for persons arrested in Imperial County during such labor troubles as might occur. During the meeting first referred to there was some discussion as to the work of organizing the Agricultural Workers Industrial League and the Trade Union Unity League in the

Imperial Valley, but there was no evidence that Spector actually took part in any plan of organization or scheme for the distribution of Communist literature or was cognizant of any overt acts in Imperial County resulting from any plan or conspiracy in which he had participated. The testimony cited does not bear out the conclusion that he engaged in any conspiracy in the county of Los Angeles, the object of which was the carrying out of unlawful acts in the county of Imperial.

 The appellants raise the point that the trial court erred in overruling their challenge to a special venire of jurors which was returned by a deputy coroner of Imperial County. During the course of proceedings the panel of drawn jurors became insufficient and the court ordered the issuance of a special venire which was directed to the coroner because of the conceded disqualification of the sheriff. The return of the venire was signed by a deputy coroner.

It does not appear from the record whether or not the coroner actually summoned some of the jurors and permitted his deputy to serve the venire upon others who were selected to make up the panel. Neither does it appear that the coroner was absent from the county. In any event, we do not consider that error was committed.

Section 4173 of the Political Code provides in part that an elisor may be appointed by the court to execute the processes thereof when the coroner and sheriff are both parties or when it appears by affidavit to the satisfaction of the court that both of these officers are disqualified.

It has been held that this section must be construed with section 226 of the Code of Civil Procedure, which provides in substance that whenever jurors are not drawn or summoned to attend any court of record or a sufficient number of jurors fail to appear such court may forthwith order a sufficient number to be summoned and direct, by its order, the sheriff or an elisor chosen by the court to. summon the number of jurors fixed by the court to serve as jurors. (*People* v. *Fellows,* 122 Cal. 233 [54 Pac. 830].)

In the case of *People* v. *Vasquez,* 9 Cal. App. 545 [99 Pac. 982], the court said: "If both sheriff and coroner are disqualified, or for any cause both are unable to act, the court must appoint an elisor. (Sec. 4173, same citation.)

By the provisions of this last section, construed with section 226 of the Code of Civil Procedure, the power of the court to appoint an elisor to execute an order for summoning a jury is limited to those cases wherein the disqualification extends to both sheriff and coroner. (*People* v. *Fellows, supra.*) There is no express provision of the code whereby the duties of the sheriff in case where he is disqualified are cast upon the coroner, except where the sheriff is a party to the action or proceeding. Someone, however, must perform such duty. Conceding an absence of any statutory provision designating who shall act in place of the sheriff in such cases, we must look to the common law of England for a rule of decision under which to determine the question. (Pol. Code, sec. 4468; *Sesler* v. *Montgomery*, 78 Cal. 486 [12 Am. St. Rep. 76, 3 L. R. A. 653, 21 Pac. 185].) According to the common law, the venire, in case the sheriff was disqualified, was directed to the coroner, who was regarded as a substitute for the sheriff. (3 Blackstone's Commentaries, 354; *May* v. *Walters*, 2 McCord (S. C.), 470.) Though the point was not at issue in the case of *People* v. *Fellows, supra*, the court holding that the power to appoint an elisor exists only in cases where both sheriff and coroner are disqualified, said: 'When the sheriff is disqualified, the duty in the first instance is always cast upon the coroner.' ''

The courts having, by implication, found that the duties of the sheriff are under certain conditions cast upon the coroner as an officer, whose position is created by statute, the same rules should prevail as to the powers of the coroner's deputies as obtain in reference to deputies in other offices, and particularly so when the acts to be performed are ministerial rather than judicial. As we have seen, the coroner, in summoning a jury, is not acting as an elisor, and his appointment or designation is therefore not as an individual but as an officer.

Section 865 of the Political Code provides that in all cases not otherwise provided for, each deputy possesses the powers and may perform the duties attached by law to the office of his principal.

Section 4147a of the Political Code provides that if the coroner is absent or unable to attend to the duties of his

office, they may be discharged by any of his deputies with like authority, as if done by the coroner himself.

Another provision of the Political Code which is pertinent and persuasive is section 4315, which provides that whenever the official name of any principal officer is used in any law conferring power, or imposing duties, or liabilities, it includes deputies.

In the case of *Hubert* v. *Mendheim*, 64 Cal. 213 [30 Pac. 633, 635], it was said: "The deputy of an executive officer is an assistant empowered by law to act in the name of the officer. He is appointed by the principal officer, but his authority is derived from the statute which permits his appointment. His functions are those of the *officer* in whose stead he discharges them. He is not the private agent of the individual who holds the office."

It may be pointed out that there is no affirmative showing that any injury was done to the appellants by reason of the venire having been returned by the deputy coroner. The trial court was not in error in denying the challenge to the special venire.

The trial court instructed the jury in the language of section 253 of the Penal Code relating to the liability of editors and publishers for the publication of any words contained in any part of a book, newspaper or serial publication.

While the instruction has little applicability to the situation to be considered by the jury, we think that any error committed in giving it was corrected by the following instruction:

"The court has given you instructions embodying such rules of law as may be necessary to assist you in arriving at a verdict. As to some of these instructions, their application depends upon the light in which you view the evidence.

"The fact that the court has given you instructions as to particular rules of law must be taken by you as an indication that such rules are necessary, applicable to the cause on trial, or as indicating that the court considers them necessarily applicable. Where there is a conflict of evidence, the question as to whether a particular rule of law is applicable depends frequently and

solely upon the conclusion as to what the facts are, and the jury are the sole judges of the facts.

"If any instruction is applicable only if a particular situation or state of facts exists, and if you find that no such situation or state of facts exists, then you should not take such instructions into consideration in your deliberations."

In addition to this, it appears from the record that the appellants requested the court to give an instruction in the same language, although as a part of a more extensive instruction. It was developed during the course of the trial that some of the appellants had in their possession and as a part of their equipment at their meeting place in Imperial County a typewriter, mimeographing machine, large quantities of paper and printing material, and that they actually printed leaflets and pamphlets which were distributed by them and which were received in evidence as exhibits in the case. It is proper to give instructions bearing upon material questions upon which there is any evidence deserving of consideration by the jury. (*People* v. *Quimby,* 6 Cal. App. 482 [92 Pac. 493].

Exception is taken by appellants to the following instruction: "All pamphlets, printed matter and other exhibits in evidence in this case which you determine from the evidence to be printed, circulated or publicly displayed by or with the knowledge, acquiescence and consent of the defendants, or either of them, you should consider for all purposes material to this case, so far as the same comes within the options, knowledge, acquiescence or consent of the defendants or either of them." The court had previously and as a part of the same instruction told the jury in substance that printed matter purported to have been circulated by the various organizations named in the indictment, but which the evidence showed had not been circulated, printed or publicly displayed with the acquiescence or consent of all of the defendants, had been received in evidence for the sole purpose of enabling the jury to determine the character of the organization of which it was claimed the defendants were members. The portion of the instructions quoted *verbatim* above amplified the first part of the instructions and instructed the jury that they might consider the evidence for all pur-

poses material to the case whenever they determined from the evidence that the printed matter had been printed, circulated, or publicly displayed by or with the knowledge, acquiescence and consent of the defendants or either of them. Objection is made that the instruction should have been qualified by the use of words which would have made it clear that the evidence could be considered only as to the particular individual defendant who had knowledge of the circulation of the printed matter and acquiesced therein.

No one instruction can state all the law applicable to a case. When the instruction is considered in its entirety and with other instructions given by the court, it is plain to a person of ordinary intelligence that the court intended to limit the application of the evidence only to the case of the particular defendant or defendants whom the jury might determine had actual knowledge of the printing, distribution and display of the printed matter or acquiesced therein.

 The court in an instruction attempted to define the terms "direct action" and "syndicalism" in language quoted from the opinion in *People* v. *Lesse*, 52 Cal. App. 280 [199 Pac. 46], which had in turn quoted definitions of various dictionaries. While the giving of the instruction was unnecessary and erroneous (*People* v. *Ware*, 67 Cal. App. 81 [226 Pac. 956]), we are of the opinion, after an examination of the entire record, that the error was harmless within the meaning of section 4½ of article VI of the Constitution. The instruction should have been limited to the definition given by the act under which the prosecution was instituted and to the terms used therein. It would be idle to make the trial court a forum for debating all the fine spun theories and distinctions which might differentiate the various groups and parties interested in the changing of the social order. It is sufficient to observe that the jury had before it the evidence in the case, the sufficiency of which is not disputed by the appellants, and the court stated in its instructions the essential principles of law involved.

In view of the conclusion which the court has expressed in regard to count one, it is unnecessary to discuss the

seventeenth and eighteenth specifications of error discussed in appellants' brief.

Appellants' nineteenth specification of error criticises an instruction given by the court as to the inference which might be drawn from a possible finding by the jury that the defendants pursued by their acts the same object, whether by the same or different means. The language was taken from *People* v. *Bentley*, 75 Cal. 407, quoting Greenleaf on Evidence. It must be assumed that the jury was composed of persons of ordinary intelligence and that they could interpret the instruction as one stating what inferences might be drawn, rather than stating a presumption or fixed rule of law.

Appellants urge that the court erred in instructing the jury as to the meaning of the word "willfully" as used in the indictment. The definition was in the language of the Penal Code, section 7, and has been repeated times without number. *McPheeters* v. *Board of Medical Examiners*, 103 Cal. App. 297, is not in point.

It is unnecessary to discuss appellants' twenty-first specification of error, which relates to an instruction in regard to count three, in view of the conclusion of this court as to that count.

Appellants offered a number of instructions which the trial court refused to give. We have carefully examined the offered instructions and find no error in the refusal of the court to give them. The law of the case was fully covered by the instructions which were given.

The court gave very full and complete instructions as to the forms of verdict which the jury might return on each count and as to each defendant.

There were provided for the jury forms of verdict in which a blank space was left before the word "guilty". To acquit each or either of the defendants it would have been necessary for the jury to write in the word "not", making the sentence read: "We, the jury in the above-entitled action, find the defendant (naming him) *not* guilty." The court exhaustively explained to the jury the procedure which they should follow in rendering a verdict either of guilty or not guilty. Exception was taken by appellants to the forms of verdict, and it is urged in behalf of this exception that it is inconsistent with a

system of law which grants to the defendant in a criminal action the presumption of innocence to require greater exertion on the part of the jury to find a defendant not guilty than would have been necessary to find him guilty.

Again we must indulge in the assumption that any body of men and women impaneled as a jury in this jurisdiction must necessarily be equipped with at least ordinary intelligence sufficient to enable them to understand the instructions of the court as they were given and to formulate a verdict in accordance with their conclusions. In the case of *People* v. *Hill,* 116 Cal. 562, the trial court omitted to furnish to the jury in a case in which the defendant was charged with murder with a form of verdict covering murder of the second degree. In deciding adversely to a complaint that the trial court committed error in making such omission, the Supreme Court said: "The law makes it no part of the duty of the judge to furnish forms of verdict to the jury, but the latter are presumed to be able to formulate their own conclusions, and in practice most usually do so. Where, therefore the jury has been properly instructed as to the different degrees of the offense, it must be presumed that if their conclusion called for a form of verdict with which they were not furnished, they would either ask for it or write one for themselves. It certainly could have no necessary tendency to preclude them from finding such a verdict."·

In our opinion the better practice is for the court to see that the jury are provided with separate and specific forms of verdict providing for every legal conclusion of the jury, that can be anticipated, but we are of the opinion that the forms of verdict handed to the jury in this instance did not add to its duties any burden that it could not have coped with intelligently.

Error is assigned by appellants to the action of the court in permitting the jury to have in the jury-room during its deliberations all of the literature introduced in evidence in the form of booklets, pamphlets, newspapers and so forth from which excerpts had been read to the jury during the course of the trial. The assignment of error is based upon the ground that the action of the court deprived the appellants of the right to confront the witnesses against them and deprived them of their liberty

without due process of law. The point is urged that the jury had access to. a great body of matter which was not actually received in evidence, which was not germane to the case, and which from its nature would tend to prejudice the jury against the appellants. As an example of such matter, appellants quote at length excerpts from the literature which bear upon the religious and social ideas of Communists and the lack of ideals which might shock the sensibilities of the jurors.

The excision or omission of such material from the exhibits should have been suggested or presented to the court during the course of the trial, and before the submission of the case to the jury. One book in particular of which appellants complain was offered by themselves as an exhibit and in offering it they should have been careful to have called to the attention of the court and jury only those portions which they regarded as material and relevant.

█ It was proper for the district attorney to read excerpts from the books to the jury. (*People* v. *Lesse, supra.*)

The books were admissible as showing the nature of the acts which the appellants were advocating. (*People* v. *Wright,* 66 Cal. App. 782 [226 Pac. 952]; *People* v. *Bailey,* 66 Cal. App. 1 [225 Pac. 752].) █ In the absence of an affirmative showing that injury resulted to appellants by reason of the fact that the members of the jury actually read parts of the printed material which had not been read in court, and in the absence of an objection on the part of appellants at the time the case was submitted to the jury, we must conclude that there was no error on the part of the court in allowing the exhibits to be taken in their entirety to the jury-room.

█ One or two documents offered for identification only were by mistake included in the material left with the jurors. No affirmative showing has been made by appellants that they were injured by such mistake. The burden is upon appellants to point out any injury which may have resulted from the acts of the court in allowing the books to be taken into the jury-room or from the inadvertent inclusion by the officers of the court of the exhibits received only for identification. In the absence of

any affirmative showing, it will be presumed that no prejudice resulted from the acts of the court or other officers. The same rule applies where exhibits have been received and subsequently withdrawn. (*People* v. *Malley, supra.*)

▮ To its verdict of guilty and following the signature of its foreman, the jury appended the following words:

"We, the jury, bring a verdict of guilty with recommendation of deportation to their native country, and any citizen of this country take the course of the law.

"J. F. STEINTORF,
"Foreman."

Appellants contend that the addition of this recommendation indicated that the verdicts were the result of passion and prejudice and not of calm deliberation.

The recommendation of the jury was surplusage and in the absence of a showing that the jurors were individually or as a group acting under the influence of passion or prejudice, any surmise as to the source or occasion of their recommendation would be simply speculative and conjectural. It was analogous to a recommendation for leniency and must be disregarded.

The presumption is that the jury performed their duty with fidelity to their oath, and that they observed the admonitions of the court as to their conduct. (*People* v. *Kramer*, 117 Cal. 647 [49 Pac. 842].)

It is unnecessary to discuss the appellants' specifications of error relating to the judgment of and the sentences imposed by the court in view of the conclusions which we have expressed in regard to the first count and third count of the indictment.

It is ordered that the order of the trial court denying the motion of the appellant Frank Spector for a new trial upon each count of the indictment and the judgment of the court against said appellant upon each count after verdict of guilty be reversed; that the orders denying the motion of each of the other appellants for a new trial upon the first and third counts of the indictment and the judgment of the court thereon be reversed; and that the order of the trial court denying the motion of each of the appellants, other than Frank Spector, for a new trial upon the second count of the indictment and the judg-

ment thereon after verdict of guilty be and each of them is affirmed.

Barnard, P. J., and Marks, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 8, 1931, and a petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 25, 1931.