[Crim. No. 3070. Third Dist. Nov. 22, 1960.]

THE PEOPLE, Respondent, v. HERBERT DALE LEWIS, Appellant.

Allan B. O'Connor, under appointment by the District Court of Appeal, for Appellant.

Stanley Mosk, Attorney General, and Raymond Momboisse, Deputy Attorney General, for Respondent.

WARNE, J. pro tem.*—Appellant was convicted of first degree murder and the penalty was fixed at life imprisonment. A motion for a new trial was denied. He has appealed from the judgment and the order denying the motion for a new trial.

At about noon on April 30th, the deceased, Wallace Millard Lucas, was seen by Sergeant Allen of the California Highway Patrol on United States Highway 40A some 3 or 4 miles west of Portola. At that time he was clothed only in his underclothing, socks and shoes. He was literally covered with blood. The traffic officer immediately took him to the Western Pacific Hospital in Portola, where he received emergency medical treatment from Doctor Charles W. Brown. On the way to the hospital he became unconscious and upon entry thereto he was in a state of deep shock. Doctor Brown testified that he had three distinct wounds on his body, consisting of a scalp wound on the back of his head, which was a stellate type of laceration, and two sharp lacerations, one on each side of his chest. The laceration on the right side extended down through the skin, muscles, ribs and into the chest cavity, while the one on the left side extended through the chest wall to the ribs. The chest wounds were inflicted by a sharp instrument. The laceration on the back of his head extended down to the skull. He remained in a critical condition and in immediate danger of death from the time he was received at the hospital until the time of his death which occurred at 5:30 on the afternoon of May 3, 1959.

An autopsy performed by Doctor V. A. Salvadorini, a pathologist, on the body of Lucas disclosed that he had received a lacerated wound at the back of his head, a clear cut fracture of the skull extending from the area of the laceration on his scalp to just beyond the midpoint of his head on the right side. His brain was swollen and there were areas of contusion at several points. There was a bruise on the top of the left shoulder of Lucas and on his left chest just below

_____
*Assigned by Chairman of Judicial Council.

the armpit. There was a sharp wound on the left side of the victim's back just below the wing bone. This wound extended down to the ribs but had not penetrated through them. There were similar lacerated wounds on the victim's back on the right side just below the wing bone. This wound went through the skin and through the sixth and seventh ribs into the chest cavity. Fragments of the ribs were protruding into the right chest cavity and had injured the lung and surrounding tissue. The heart was about twice normal size and revealed evidence of old and fresh disease. The old disease was determined as rheumatic heart disease, which affects the valves of the heart. He also had extensive hardening of the arteries, known as arteriosclerosis. He had evidence of two previous heart attacks (two infarctions) and of a fresh thrombosis of one of the coronary arteries. Doctor Salvadorini determined that the immediate cause of Mr. Lucas's death was occlusion or blocking of the coronary artery, known as coronary thrombosis. It was his opinion that the injuries sustained by Lucas ''contributed to the overall picture in the production of this man's death.'' He did state however that it was not medically improbable that a man in the condition of Lucas could die spontaneously without having received any injury.

It was also Doctor Brown's opinion that the injuries sustained by Lucas helped precipitate the coronary thrombosis which was the immediate cause of death.

Likewise, in the opinion of Doctor Willard S. Bross, another attending physician, the injuries sustained by Lucas could have precipitated a heart attack and in fact did.

After Lucas was taken to the hospital Sergeant Allen returned to the point on the road where he had picked up Lucas. The footprints of Lucas were discovered and traced back through the adjoining woods to the Schulz home where the attack had taken place.

The area near the Schulz home was such as to indicate that it was uninhabited, as a second house near the Schulz home was boarded up and had the appearance of not being lived in. There were no vehicles parked at the houses on that day, nor was anyone at the scene. Mr. and Mrs. Schulz had left their home at approximately 10 a. m. on the morning of the 30th and did not return until after 1 o'clock that afternoon.

In front of the Schulz home was found a large pool of blood. There were blood stains from the front corner of the

house to the back corner of the west side, and there were spots of blood between the house and a pine tree, which pine tree had the imprint of a bloody hand on it. There was blood at the back of the house.

On May 1st, the day after the robbery, two men from the sheriff's office conducted a search of the area near the scene of the crime. They proceeded east from the scene along both sides of United States Highway 40A. They checked all culverts and brush on both sides of the road. When they arrived at a creek which traversed this road, they discovered the victim's pants and shirt, a shingling hatchet, and a cigarette lighter. There was still blood on the shirt and pants. The hatchet appeared to be wrapped in the shirt. The hatchet contained a piece of tissue, a trace of blood and several short grey human hairs. When examined with a microscope the tissue had the appearance of flesh. In the pocket of the shirt was discovered a bus ticket and a property receipt which contained the victim's signature. In the pocket of the trousers were found the victim's keys and a credit card. A hatchet similar to the one found had been used by Mr. Schulz in the garage at his home, and this was the last place he had seen it.

Shortly after noon on April 30th, Officer Gamble of the California Highway Patrol was on duty about 10 miles east of Portola, and at that time he observed appellant driving east in a grey Plymouth station wagon.

When appellant arrived in Reno he was placed under arrest. At that time he was wearing a white shirt, a pair of pants, and a pair of shoes. There were splatters of blood in the area of the cuffs of the trousers worn by appellant. There was blood on the shirt worn by the appellant and on his shoes.

At the time of his arrest the appellant had in his possession the wallet of Mr. Lucas which contained various identification and credit cards, as well as other papers. He likewise had in his possession two bail receipts which contained the signature of Mr. Lucas, and a $50 traveler's check which also contained his signature and which had been given to Lucas the previous day. In addition, he had ten $100 bills and $64.96 in other change, making a total of $1,064.96. Mr. Lucas had been in Modesto, California, and had left there some time during the late afternoon of April 28th to return to Quincy. At that time he had $1,073.98 in his possession.

Just a few weeks before the murder the appellant found it necessary to borrow clothes to wear to work. He twice asked to borrow money from his roommate. The last such

request was made on April 29th, the day preceding his arrest. Appellant likewise attempted on several occasions to borrow from a Mr. Sheldon. The last such attempt was made in April. On April 29th he stated to a Mr. Sprinkel that he had no luggage and that he wanted to find a job so he could procure enough money to return home to see his girl friend.

When he was being booked the appellant gave the name of Lucas and claimed that the various identification cards which bore Lucas's name were his. In the course of checking the wallets which the appellant had in his possession, two fishing licenses were discovered, one issued to Mr. Lucas and the second to the appellant. The obvious discrepancy in age which appeared on the Lucas license and the age of the appellant was pointed out to appellant who continued to insist that he was Lucas. Eventually, after some discussion he admitted his identity.

Later that day the appellant was interviewed by Officer Gamble of the California Highway Patrol who asked him if he had earned the money in his possession by working. The appellant stated that he had brought it with him from Illinois. He denied ever having known Lucas. When asked where he had obtained Lucas's wallet and papers, he stated he had found them on the seat of the car and put them in his pocket. When asked where he had been between the hours of 10 o'clock and noon, he said he was not sure but possibly in downtown Reno. When asked what his connection was with Mr. Sprinkel, the owner of the automobile, he stated that he and Sprinkel, together with a third party, were going into business together. When asked whether or not he had been near Portola, he said that he had not. As the officer had noticed blood on appellant's shirt, he asked him if he had any fresh cuts on his body. Appellant replied that he had a cut on his back. The officer requested appellant to remove his shirt and when he acquiesced the officer attempted to discover a cut on appellant's back but was unable to do so.

On May 12th the appellant was interviewed by Raymond J. Stonehouse, Special Agent for the State Bureau of Criminal Identification and Investigation for the State Department of Justice. At that time appellant stated that on the day of the crime he had not been in the vicinity of Portola and had not left Reno prior to his arrest. On May 15th Mr. Stonehouse again interviewed the appellant. At that time appellant stated that he had told his attorney that he was not in the vicinity of

Portola on the day of the crime and that he had not left Reno that morning. He then stated that there was one piece of evidence which had not been found. That evidence was "a gun." When asked by the officer to tell about it, appellant stated that he had been in Reno on the morning of April 30th. While at a gas station in Mr. Sprinkel's car he had observed Mr. Lucas hitchhiking on the highway. Since he had hitchhiked himself he realized that Lucas was in a position where it would be hard for him to get a ride, so appellant decided to take Lucas out of town to the open highway. Lucas told him that he was on his way to Quincy and was in a hurry to get there as his son's wife was expecting a baby. The appellant decided to take him to Quincy since he had nothing else to do. In the course of this trip Lucas produced a bottle of Old Crow whiskey and began to drink from it. Appellant asked him not to drink while they were in the car as it was not allowed. As they approached the Schulz residence Lucas produced a gun and ordered him to turn into a dirt road which was parallel to the highway upon which they were traveling. They drove into the yard in front of the Schulz home, where Lucas ordered the appellant to park. The appellant was then ordered out of the car by Lucas, who likewise alighted. While keeping the gun on appellant Lucas removed his trousers and placed them on the front seat of the car. Appellant asked Lucas what he wanted. Lucas rubbed his private parts and said, "We are going to have some fun." About that time they heard an automobile approaching and Lucas ordered appellant to stoop down and to appear as if he were doing something. When the car passed Lucas looked over his shoulder at it and this gave appellant the opportunity he had been looking for. He jumped into the air and struck Lucas with both his feet in the shoulder. Lucas fell backward and struck his head on the corner of the bumper. The blow dazed Lucas momentarily. Appellant then turned and ran north along the west side of the building. As he approached the rear of the building a shot was fired and he ran into the open garage. Through a window in the garage he observed Lucas standing near the northwest corner of the house. He found a shingling hatchet lying on the floor in the garage. He picked it up and walked out of the garage. Just before reaching the end of the house appellant started running and turned toward Lucas who was still standing at the corner of the house. He threw the hatchet while approximately 20 or 25 feet from Lucas. He turned around

after throwing the hatchet, heard a thud and realized that he had struck Lucas with the hatchet. From there he ran into a wooded area to the east. Just as he entered this area a second shot was fired. As he proceeded through the woods he heard Lucas following him so he reversed his direction and headed toward the Schulz house. At the rear of the house he looked back and saw Lucas just coming on to the road, and at that time a third shot was fired by Lucas. Appellant then ran to the side of the house and at the northwest corner of it he observed that the shirt Lucas had been wearing was lying on the ground with the hatchet on it. The appellant picked up these articles and continued toward the car. He observed a large spot of blood on the left front bumper of the automobile which he wiped off with the shirt. He placed the shirt and hatchet in the automobile and pushed the trousers, which were already in the car, on top of them. He got into the car and drove to the highway. As he reached the highway he stopped to watch for traffic. At this time he looked into the rearview mirror and saw Lucas standing at the corner of the house waving the gun. He stated that no more shots were fired. Appellant then drove east on United States Highway 40A, stopping at a bridge, at which point he threw the pants, shirt and hatchet from the side of the bridge into a small creek. He proceeded to Reno where he was placed under arrest. He stated that he saw Lucas's papers for the first time when he was booked. He claimed that the money found on him at the time of his arrest had been brought by him from Illinois and was part of the money earned and saved by him while he was working. That afternoon the appellant repeated substantially the same story to the sheriff. After this second statement the appellant was taken to the scene of the crime where he pointed out to the police the various positions where the events he had previously related occurred.

On May 16th appellant was again interviewed and gave the following statement to the police: He arrived in Marysville in March, 1959, and worked in Marysville for one week during the first part of April. On April 28th or 29th he met a Mr. Sprinkel at Redding. From there they went to Chico, Marysville, Grass Valley, Truckee and finally to Reno. When they stopped at Marysville appellant had taken Mr. Sprinkel's automobile and contacted several individuals whom he knew. He claimed that he had met Lucas in Reno. Lucas had informed him that he was going to Quincy. The appellant offered Lucas a ride. As they were driving Lucas pro-

duced a bottle of liquor and offered it to the appellant who refused it. Later Lucas pulled a gun and told the appellant not to worry about listening to the radio as he would not have long to listen. Lucas ordered the appellant to slow down at a turnoff on the highway and park the automobile. Lucas then ordered the appellant out of the automobile. Appellant alighted from the automobile as did Lucas. Lucas proceeded to take off his pants which he placed on the front seat of the automobile. When he asked Lucas what he was going to do, Lucas rubbed himself in his private area and laughed. About that time an automobile came from the west, at the sound of which Lucas ordered the appellant to stoop down so he would appear to be looking for something on the ground. While they were in this crouched position, the appellant dropkicked Lucas in the shoulder. The force of this blow threw Lucas backward and he hit the back of his head on the bumper of the car. The appellant ran around the end of the house toward the shed. At this time Lucas fired one shot. Lucas followed the appellant and hollered, ''you can go nowhere; you cannot get away.'' The appellant entered the garage. From the garage he was able to observe the movements of Lucas. The appellant procured a hatchet in the garage. Thus armed he emerged and approached close enough to Lucas to throw the hatchet at him. He never saw it hit the victim but he heard the thud produced by the contact. At the time he threw the hatchet the appellant claimed that Lucas was not wearing a shirt. The appellant claimed that he discovered the shirt, more or less folded, on the ground with the hatchet lying on top of it at the northwest corner of the house. The appellant picked up the hatchet and shirt and ran toward his car. He noted blood on the bumper of the car and wiped the bumper two or three times. He likewise noticed blood on the hatchet and on the shirt. He threw the shirt and the hatchet into the car. He did not see Lucas anywhere. He backed up the automobile, went to the highway, and headed toward Reno. As he drove away he noticed in the rearview mirror the reflection of Lucas between the shed and the house. Lucas was wobbling back and forth and aiming the gun. The appellant drove without stopping to Long Valley Creek where he threw the hatchet and the clothes out of the automobile. The appellant denied that he ever had any of Lucas's papers on him. He claimed that the police in Reno had brought them in and placed them with his belongings while he was being booked. He claimed that he had $1,064.96 in his possession

at the time he was apprehended. This money he claimed to have earned by working and saving since the time he had quit school. An intensive search of the scene of the crime failed to uncover any gun.

The appellant did not testify in his own behalf nor did he call any witnesses to testify for the defense.

The trial court instructed the jury that "Although there are two degrees of murder, the evidence in this case is such that the defendant is innocent of the charge of murder or the defendant is guilty of murder in the first degree, as charged in the indictment." The court also gave an instruction on justifiable homicide in self-defense. Defendant prepared and proposed an instruction informing the jury that the offense of violation of section 187 of the Penal Code (murder) necessarily included the crime of violation of section 245 of the Penal Code, i.e., assault with a deadly weapon or assault with means likely to produce great bodily harm. This proposed instruction the court refused to give. The trial court also refused a proposed instruction informing the jury that if they found the defendant guilty of an offense included within the charge of the indictment, but entertained a reasonable doubt as to the crime of which he was guilty, it was their duty to convict him only of the lesser offense.

A defendant "may be convicted . . . of a lesser offense, if he was charged with felony which included the lesser offense." (*Becker* v. *Superior Court*, 151 Cal. 313, 317 [90 P. 689] ; citing *Ex parte Donahue*, 65 Cal. 474 [4 P. 449].)

"Section 1159 of the Penal Code provides that the 'jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense'; and this section has been construed to mean that 'to be "necessarily included" in the offense charged, the lesser offense must not only be part of the greater in fact, but it must be embraced within the legal definition of the greater as a part thereof.' " (*People* v. *McGrath*, 94 Cal.App. 520, 522 [271 P. 549] ; citing *People* v. *Kerrick*, 144 Cal. 46 [77 P. 711].)

Manslaughter is clearly recognized in California to be an offense necessarily included in murder. (*People* v. *Huntington*, 138 Cal. 261, 264 [70 P. 284] ; *People* v. *McFarlane*, 138 Cal. 481 [71 P. 568, 72 P. 48, 61 L.R.A. 245] ; *People* v. *Shimonaka*, 16 Cal.App. 117 [116 P. 327] ; *People* v. *Borrego*, 7 Cal.App. 613 [95 P. 381].) Therefore, under the indictment in the instant case, which merely charges murder as defined under the statute, the defendant might have been

convicted of manslaughter under section 1159 of the Penal
Code.

As pointed out in *People* v. *Carmen,* 36 Cal.2d 768
[228 P.2d 281], instructions must be responsive to the issues
as determined by the evidence. In that case the defendant
specifically submitted an instruction on manslaughter which
was refused by the trial court. At page 773 the court
cites from *People* v. *Burns,* 88 Cal.App.2d 867, 871 [200 P.2d
134] : " 'It is *elementary* that the court should instruct the
jury upon every material question upon which there *is any
evidence deserving of any consideration whatever.* [Citing
cases.] *The fact that the evidence may not be of a
character to inspire belief does not authorize the refusal of an
instruction based thereon.* [Citing cases.] *That is a question
within the exclusive province of the jury. However incredible
the testimony of a defendant may be he is entitled to an in-
struction based upon the hypothesis that it is entirely true.*
[Citing cases.] It is the duty of the court to instruct
the jury in regard to any included offense which the evidence
tends to prove. [Citing cases.] In *People* v. *Carroll,*
*supra* [20 Cal.App. 41 (128 P. 4)], the court said (p. 45) :
"It is undoubtedly the rule that, where there is *any* evidence
from which a reasonable inference may be drawn that the
crime of which the defendant was convicted was of a lesser
degree . . . it is *prejudicial* error to withdraw from the jury
the consideration of such evidence and confine the instructions
to the crime [charged]." ' " (In the Carroll case the question
was whether an instruction on petit larceny should be given,
where the crime charged was grand larceny.) In the
Carmen case the court continued: "It has been repeatedly
held that it is reversible error to refuse a manslaughter in-
struction in a case where murder is charged, and the evi-
dence would warrant a conviction of manslaughter. [Citing
cases.]"

It might be said that the present case is distinguishable
from the Carmen case in that here the defendant made no
*specific* request for an instruction upon manslaughter but only
generally requested an instruction as to lesser included of-
fenses. This might be treated as the equivalent of no request
at all, but if such is the case, the rule enunciated in *People* v.
*Wade,* 53 Cal.2d 322 [1 Cal.Rptr. 683, 348 P.2d 116] ; *People*
v. *Manzo,* 9 Cal.2d 594, 598-599 [72 P.2d 119] ; *People* v. *Best,*
13 Cal.App.2d 606, 610-611 [57 P.2d 168] ; *People* v. *Warren,*
16 Cal.2d 103, 117 [104 P.2d 1024] ; and *People* v. *Scofield,*

598

203 Cal. 703 [265 P. 914], would be applicable. The rule as stated in *People* v. *Wade, supra,* is that the trial court must instruct on the "general principles of law governing the case," even though not requested to do so, but need not instruct on specific points developed at the trial unless requested. The " 'general principles of law governing the case' " are "those principles of law commonly or closely and openly connected with the facts of the case before the court. . . . It has, for example, been held in prosecutions for murder that it is error to fail to give an unrequested instruction on manslaughter where the facts of the case would warrant a verdict of guilt as to such offense. [Citing *People* v. *Manzo, supra,* and *People* v. *Best, supra.*] The statutory definition of manslaughter is one which a judge is required to refer to often." In the same case it was also held that the trial court need not be omniscient in this type of situation and the evidence must illuminate the need for such instruction.

 Applying the above rules to the evidence in the instant case, we are of the opinion that defendant's request for instructions upon the lesser included offenses was sufficient to bring this case within the rule announced in *People* v. *Carmen, supra,* and as a consequence the trial court committed prejudicial error by failing to instruct upon manslaughter. Taking the defendant's statements as true the jury could have found that the defendant acted under the influence of fear which was not reasonably justified by the circumstances. This result is inferable from defendant's statement that he kicked the deceased, who was momentarily stunned, and then ran to the barn where he found the hatchet. A jury might well find that defendant was acting in mortal fear, but that under the circumstances he, being a younger man, and the deceased in a stunned condition, was not acting in a reasonably founded belief of imminent peril to life or great bodily harm. As said in *People* v. *Best,* 13 Cal.App.2d 606, 610 [57 P.2d 168] : ". . . If the circumstances are both adequate to raise and sufficient to justify a belief in the necessity to take life in order to save oneself from such a danger, where the belief exists and is acted upon, the homicide is excusable upon the theory of self-defense [citing cases] ; while, if the act is committed under the influence of an uncontrollable fear of death or great bodily harm, caused by the circumstances, but without the presence of all the ingredients necessary to excuse the act on the ground of self-defense, the killing is manslaughter." Under the Carmen case, *supra,* it is

sufficient that there is some evidence to raise the issue; the evidence need not be strong or compelling in any way.

Assuming that defendant's request was not sufficient under the *Carmen* rule, the result here should be the same under the rule announced in *People* v. *Wade, supra.* In this case the issue of manslaughter arose and was "closely connected" to the evidence introduced concerning defendant's statements as to what occurred at the scene of the crime. That evidence, if believed, suggests the possibility of a verdict of manslaughter, and it is believed that this hypothesis is not so abstruse as to require a request for the instruction to have been made by the defendant. It is immaterial that a defendant's main defense is based on the theory of self-defense. Under Penal Code, section 1127, the trial court must state to the jury *all* matters of law *necessary for their information.* (*People* v. *Wright,* 167 Cal. 1, 4 [138 P. 349].)

The above holding is in no way contrary to the decision in *People* v. *Mitchell,* 14 Cal.2d 237, 242 [93 P.2d 121], where the court stated that it was not prejudicial to refuse an instruction on manslaughter. In that case, under instructions calling for a verdict of first degree murder or an acquittal, the jury found murder in the first degree, calling for the *death penalty* and not life imprisonment. Also, it should be noted that in that case the court found defendant's evidence supporting manslaughter "beyond belief." In *People* v. *Mott,* 211 Cal. 744 [297 P. 23], no evidence was offered to support a finding of manslaughter, and refusal of a proposed instruction was held to be proper.

Under the evidence before the trial court in this case there could be doubt whether or not the defendant's acts were the proximate cause of the death of Lucas. There was evidence that the deceased had had two prior heart attacks and that the immediate cause of death was coronary thrombosis. Although Doctor Salvadorini was of the opinion that the injuries sustained contributed to the death of Lucas, he also stated that it was not medically improbable that a man in Lucas's condition could die spontaneously. On this basis appellant requested an instruction on assault with a deadly weapon and assault with means likely to cause great bodily harm. Appellant contends that the refusal of the trial court to give the instruction was error.

As a general rule "A person cannot be convicted of an offense (other than a necessarily included offense) not charged against him by indictment or information, whether or

not there was evidence at his trial to show that he had committed that offense. [Citing cases.]'' (*In re Hess,* 45 Cal.2d 171, 174 [288 P.2d 5].) ▮ In *People* v. *Marshall,* 48 Cal.2d 394, 398 [309 P.2d 456], "necessarily included offense" is defined as follows: ". . . 'If, in the commission of acts denounced by one statute, the offender must always violate another, the one offense is necessarily included in the other'; . . .'' It is clear that murder need not necessarily be committed with a deadly weapon or with a means likely to cause great bodily harm. The Marshall case defined the "crime charged" as not *necessarily* limited to the statutory definition, but that certain offenses not necessarily included in the statutory definition of the crime *may be* made included offenses if the indictment includes all the elements of the lesser crime. ▮ Thus, if the indictment in this case had charged murder with a hatchet, then assault with a deadly weapon, or with means likely to cause great bodily harm would be necessarily included offenses. The indictment here did not charge murder by this means, but merely the statutory crime in general terms. Under *People* v. *Marshall, supra,* and *In re Hess, supra,* the defendant could not have been convicted of the assault described. Therefore, there was no error in the trial court's refusal to give the requested instruction.

In the case of *People* v. *Carmen, supra,* the rule is not modified as laid down above. In the recent case of *People* v. *Gallagher,* 168 Cal.App.2d 417, 427 [336 P.2d 256], it is pointed out that the rule in *People* v. *Carmen, supra,* "only applies to necessarily included offenses, where the accused could be guilty of the charged offense, or of the included offense, but not of both. It does not apply to situations where the two offenses involved are separate and distinct. . . .''

▮ Appellant's counsel at the trial, and in the presence of the appellant, stipulated that the transcript of the testimony of Doctor Salvadorini, which they had taken apart in correcting, could be given to the jurors and taken into the jury room for their examination during their deliberations rather than having it read to them by the court reporter.

Appellant contends, notwithstanding the stipulation, that it was error to permit the jury to take into the jury room the transcript of the doctor's testimony. There is no merit in this contention. The consent of counsel for appellant made in appellant's presence that the transcript could be given to the jury and taken by it into the jury room during their deliberations was a waiver of all objections, and we see no error or

objection in such procedure nor in the action of the trial court. (*People* v. *Mahoney*, 77 Cal. 529 [20 P. 73].)

Even if it could be said that it was error to allow this transcript to be taken into the jury room, that would not mean that a reversal is mandatory. Prejudice is not presumed because the jury took certain matters into the jury room with them. Rather, prejudice must be affirmatively established by the appellant. (*People* v. *Horowitz*, 70 Cal. App.2d 675, 704 [161 P.2d 833]; *People* v. *Horiuchi*, 114 Cal. App. 415, 437 [300 P. 457]; *People* v. *Walker*, 150 Cal.App.2d 594, 603 [310 P.2d 110].) Here there is no affirmative showing that the taking of the transcript of Doctor Salvadorini's testimony into the jury room was prejudicial. In fact, the record is quite to the contrary since one of the defenses relied upon by the appellant was that the death of Lucas was not the result of the injuries he received, but the result of a coronary thrombosis, and in support of this contention he relied heavily upon Doctor Salvadorini's statement that it was not medically improbable that death occurred spontaneously without the contribution of the injuries.

Appellant next contends that the hypothetical questions asked each of the three doctors called by the prosecution contain the opinions and conclusions of the other two doctors. Such is not the fact. The matters of which the appellant complains here were not conclusions or opinions of the other doctors, but a statement of their findings. While the opinion of an expert cannot be predicated upon that of another, it is proper for an expert to express his own opinion based on facts testified to by another expert, or on tests made by other experts. (*Christiansen* v. *Hollings*, 44 Cal.App.2d 332 [112 P.2d 723]; *Hope* v. *Arrowhead & Puritas Waters, Inc.*, 174 Cal.App.2d 222, 230 [334 P.2d 428].)

Lastly, appellant contends that error resulted from the admission of evidence which had been obtained as the result of an illegal search and seizure. The items complained of were the personal property of Lucas which were found in the appellant's possession at the time of his arrest. Those articles were admitted in evidence over the objection that they were the product of an unreasonable search and seizure.

The record shows that Officer Thompson and Officer Hatzi, police officers in Reno, Nevada, while in their radio-equipped squad car received a dispatch notifying them of a robbery which had occurred outside Portola, California, together with a description of the suspect and the automobile he was driving.

The automobile was described as a grey 1958 Plymouth station wagon. The suspected robber was described as being slender, dark complexioned, black hair, between five feet ten inches and five feet eleven inches in height, about 30 years of age, and was wearing a white shirt and dark pants. As they approached the intersection of 4th and Virginia Streets in Reno it was necessary for them to stop for a red signal light. It was at this time that they noticed a Plymouth station wagon two car lengths behind them which matched the description that had been given them of the suspected robber's Plymouth automobile. They got out of the police car and went to appellant's automobile. As they approached he did not look at either officer. He had his hands in his lap. One of the officers, fearing that he might be armed, ordered the suspect to put his hands on the steering wheel, which he did. They then observed dark stains on his hands and a small brownish colored stain on the front of his shirt which appeared to be blood stains. They ordered appellant out of the car and began to "frisk" him for any weapon which he might be carrying on his person and in doing so they found the sum of $1,064.96, two fishing licenses, one made out to himself and one made out to Lucas. Before making the search they noticed blood stains on his clothes. The appellant was asked where he had been, but did not give a full account of his whereabouts. All he could tell the officers was that he had been to some gas station out of town.

The officers' observation of a Plymouth station wagon of the same color and year model as that being driven by the suspected robber, their observation that the driver's appearance and clothing matched the description of the suspected robber, and the fact that the car came from the direction of the scene of the robbery afforded reasonable grounds for stopping appellant's car and questioning him. These circumstances, along with their observation of what appeared to be blood stains on appellant's hands and clothing, afforded reasonable and probable cause to arrest and search the appellant. (*People* v. *Borbon*, 146 Cal.App.2d 315, 319 [303 P.2d 560]; and cases cited.)

No other points require discussion.

The judgment and the order denying a new trial are reversed.

. Van Dyke, P. J., and Schottky, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied January 18, 1961.