[Crim. No. 1014.   Second Appellate District, Division Two.—April 30,
1924.]

THE PEOPLE, Respondent, v. PAUL WARE et al.,
Appellants.

[1] CRIMINAL LAW—CRIMINAL SYNDICALISM—INSUFFICIENT EVIDENCE.
In a prosecution for a violation of the Criminal Syndicalism Act,
wherein it is charged that defendant did "organize and assist

1. Validity of legislation directed against social or industrial
propaganda deemed to be of a dangerous tendency, notes, 1
A. L. R. 336; 20 A. L. R. 1543. See, also, 5 Cal. Jur. 506.

in organizing" and knowingly become and was a member of the I. W. W., the evidence is insufficient to justify a verdict of guilty, where there is no evidence that defendant ever organized or assisted in organizing the I. .W. W.—that society having been completely organized and in existence before defendant had anything to do with it—and defendant not only did not become a member in the county in which he was being prosecuted, but there is no evidence to show that he was in that county at any time prior to the indictment.

[2] Id.—Conspiracy to Commit Criminal Syndicalism — Jurisdiction—Evidence.—In a prosecution on a charge of conspiracy to commit the crime of criminal syndicalism, it is possible to find the defendant guilty, notwithstanding he was not in the state prior to the indictment, if, within three years prior to the indictment, any of his co-conspirators committed any overt act to effect the object of the conspiracy within the county in which the defendant is being prosecuted.

[3] Id.—Unlawful Character of Organization—Hearsay Evidence. In prosecutions under the Criminal Syndicalism Act, where it is charged that the accused is a member of an organization which advocates criminal syndicalism or- that he published written or printed matter which advocates or teaches the purposes or principles of such an organization, it is incumbent upon the people to prove in each case the unlawful character of the organization; and such fact may not be proven by hearsay testimony, such as the testimony of a witness as to talks which he had with persons whom he believed to be, but who might not have been, members of such organization.

[4] Id.—Admissible Evidence—Conversations With Members.—In such a prosecution, in order to prove the unlawful character of the organization, testimony as to statements, speeches and declarations made in the hearing of the witness by, or in the presence of, members of the organization, at recognized meetings thereof in its headquarters or halls or in such places and on such occasions as are proved to have received the sanction and countenance of the organization, is admissible; also witnesses may testify as to conversations had· with members of the organization whose membership is proved by competent evidence and is of such a character as to show that it carried with it the authority of the organization to make declarations as to its purposes, objects, principles and teachings.

[5] Id.—Repetition of Conversations and Statements—Inference as to Meaning.—In such a prosecution, a witness testifying to statements, speeches or declarations made in his presence by

3.  See 8 Cal. Jur. 83; 10 Cal. Jur. 1033; 10 R. C. L. 958.
5.  See 10 Cal. Jur. 948; 11 R. C. L. 564.

members of the I. W. W., at recognized meetings or in places and upon occasions which have received the organization's sanction and countenance, or to conversations had with officers or leaders whose membership and rank have been proved by competent evidence and whose official positions are such as to carry authority to make on behalf of the organization declarations of its purposes, objects, principles and teachings, must not give his inference as to the meaning of the language heard by him, but must confine his testimony to recounting the substance of the statements, speeches, declarations or conversations, so far as his memory will enable him to recall it.

[6] ID.—DEFINITION OF CRIMINAL SYNDICALISM—MISLEADING INSTRUCTION.—In such a prosecution, after having read to the jury the Criminal Syndicalism Act and instructed them that the term "criminal syndicalism" is defined in the law read to them and they are to be governed by that definition, it is error to further instruct the jury that said term is defined in Webster's New International Dictionary as follows: "It aims to abolish the present political and social system by means of the general strike, and direct action, which in any kind of action that is directly effective, whether it be a simple strike, a peaceful public demonstration, sabotage or revolutionary violence," as this latter instruction is misleading and tends to confuse the jury.

(1) 33 **C. J.**, p. 163, sec. 19, p. 164, sec. 25, p. 165, sec. 25. (2) 12 **C. J.**, p. 640, sec. 235; 16 **C. J.**, p. 163, sec. 198. (3) 33 **C. J.**, p. 164, sec. 25, p. 166, sec. 26. (4) 33 **C. J.**, p. 164, sec. 25, p. 166, sec. 26. (5) 16 **C. J.**, p. 747, sec. 1532; 33 **C. J.**, p. 166, sec. 26 (1926 Anno.). (6) 33 **C. J.**, p. 163, sec. 20, p. 165, sec. 25.

APPEAL from a judgment of the Superior Court of Los Angeles County. Russ Avery, Judge. Reversed.

The facts are stated in the opinion of the court.

R. W. Henderson for Appellants.

U. S. Webb, Attorney-General, and Erwin W. Widney, Deputy Attorney-General, for Respondent.

FINLAYSON, P. J.—The defendants Ware, Kohn, Nolan and White, who with eighteen others were jointly charged with the crime of criminal syndicalism, have appealed from the judgment of conviction and from the order denying their motion for a new trial.

6. See 2 **Cal. Jur.** 1026; 14 **R. C. L.** 775.

The indictment contains two counts in each of which the defendants are charged with criminal syndicalism alleged to have been committed in the county of Los Angeles. The first count, drawn under subdivision 4 of section 2 of the Criminal Syndicalism Act, charges that defendants did ''organize and assist in organizing and knowingly become and were members'' of the Industrial Workers of the World, the nature and character of which organization is then averred. For brevity the organization will be referred to as the I. W. W. The second count is so inartificially drawn that we are left in doubt as to whether it is an attempt to charge a conspiracy to commit some one of the crimes denounced in section 2 of the act or to charge a violation of subdivision 3 of that section, i. e., the crime of publishing printed matter of the character condemned in that subdivision. The appellants Ware, White and Nolan were convicted under the first count and acquitted under the second; the appellant Kohn was convicted under the second count and acquitted under the first.

There is no evidence that Ware, White or Nolan ever organized or assisted in organizing the I. W. W. That society was completely organized and in existence before appellants had anything to do with it. And the act of bringing in or assisting to bring in members is not the equivalent of ''organizing or assisting in organizing'' such a group of persons. (*People* v. *Thurman,* 62 Cal. App. 147 [216 Pac. 394] ; *People* v. *Thornton,* 63 Cal. App. 724 [219 Pac. 1020].) Neither Ware nor White became a member of the I. W. W. in the county of Los Angeles, they having joined the organization outside of this state, but each of those two defendants continued to retain his membership in, and he was in fact a member of, the I. W. W. while he was in the county of Los Angeles and within three years prior to the filing of the indictment. **[1]** Nolan not only did not become a member in Los Angeles County, but there is no evidence to show that he was in that county at any time prior to the indictment, and therefore there is no evidence that he was a member in Los Angeles County as charged in the indictment. As to him, therefore, the evidence unquestionably is insufficient to support the verdict. It was stipulated that Kohn was not in the state at any time prior to the filing of the indictment. **[2]** If the second count of

that pleading must be construed as charging a conspiracy to commit the crime of criminal syndicalism, and if the several publications of the printed matter described therein are to be regarded as nothing more than overt acts done to effect the object of such conspiracy, then notwithstanding Kohn was not in the state prior to the indictment it nevertheless is possible that he could be found guilty of such conspiracy if, within three years prior to the indictment, any of his co-conspirators committed any one of such overt acts within the county of Los Angeles. See *Hyde* v. *United States,* 225 U. S. 347 [Ann. Cas. 1914A, 614, 56 L. Ed. 1114, 32 Sup. Ct. Rep. 793, see, also, Rose's U. S. Notes], and section 27 of the Penal Code. If, on the other hand, the second count is to be construed as an attempt to charge the substantive offense of criminal syndicalism and not a conspiracy to commit it, then it unquestionably must be held that the evidence is insufficient to support the verdict against Kohn, who at no time prior to the returning of the indictment by the grand jury did anything personally in the county of Los Angeles which is denounced by the Criminal Syndicalism Act. See *People* v. *Leonard,* 43 Cal. App. Dec. 589 [225 Pac. 461]. There is substantial ground to support the conclusion that the second count is an attempt to charge one or more of the substantive crimes defined in section 2 of the act and not an attempt to charge a conspiracy to commit any one of such crimes. That count commences as follows: ''And for a second and separate cause of action against the said defendants . . . , and being a different statement *of the same offense as that charged in Count I* of this indictment, (italics ours) the said defendants . . . are accused,'' etc. Not only this, but, with the evident purpose of complying with section 951 of the Penal Code by making a general statement of the ''legal appellation'' of the crime intended to be charged, the second count, in its commencement, declares that the defendants are accused by the grand jury ''of the crime of criminal syndicalism, a felony.'' As aids to construction, these statements in the commencement of the second count lend color to the theory that the grand jurors intended to charge the defendants with the commission of one or more of the substantive crimes defined in section 2 of the act and not to charge them with a conspiracy to commit any of such crimes. We do not find

it necessary, however, to pass upon this question. For though the evidence might possibly be sufficient to support the verdict against Kohn if conspiracy be the crime with which he is charged in the count upon which he was found guilty, there are errors in the record of so grave a character as to necessitate a reversal as to all of the appellants.

One of the most serious errors of which appellants justly complain is the admission against them of hearsay evidence and of incompetent opinions and conclusions. **[3]** In prosecutions under the Criminal Syndicalism Act, where it is charged that the accused is a member of an organization which advocates criminal syndicalism or that he published written or printed matter which advocates or teaches the purposes or principles of such an organization, it is incumbent upon the people to prove in each case the unlawful character of the organization. (*People* v. *Thornton, supra.*) In making such proof the following rules of evidence, sanctioned by authority and fortified by reason, should be observed: The testimony of a witness as to talks which he had with persons whom he believed to be members of the organization, whether such belief be founded upon membership cards shown to the witness or upon declarations made to him by such supposed members, and in which talks the persons whom the witness so believed to be members made statements of what purported to be the purposes, objects, principles or teachings of the organization, is hearsay testimony and as such is inadmissible. (*State* v. *Gibson,* 115 Wash. 512 [197 Pac. 611] ; *State* v. *Cantwell,* 119 Wash. 665 [206 Pac. 362].) It may be that the persons quoted by the witness were not members of the organization, though they claimed to be. They may have obtained their membership cards through some species of fraud, or it may be that they were not acquainted with the principles and teachings which they professed to know. These are matters which the defendants in such actions should have the right to search out by cross-examining the persons who vouchsafed the information given to the witness. (*State* v. *Gibson, supra.*) **[4]** Testimony as to statements, speeches and declarations made in the hearing of the witness by, or in the presence of, members of the organization, at recognized meetings thereof in its headquarters or halls or in such places and on such occasions as are proved to have received the sanction and

countenance of the organization, is admissible. (*State* v. *Pettilla,* 116 Wash. 539 [200 N. W. 332].) Also witnesses may testify as to conversations had with members of the organization whose membership is proved by competent evidence and is of 'such a character as to show that it carried with it the authority of the organization to make declarations as to its purposes, objects, principles and teachings, as, for example, where, by competent evidence, the conversations are shows to have been had with leaders and officers of the organization in the course of the performance of their duties as such. (*State* v. *Pettilla, supra; State* v. *Kowalchuk,* 116 Wash. 592 [200 Pac. 333].)

[5] A witness testifying to statements, speeches or declarations made in his presence by members of the I. W. W., at recognized meetings or in places and upon occasions which have received the organization's sanction and countenance, or to conversations had with officers or leaders whose membership and rank have been proved by competent evidence and whose official positions are such as to carry authority to make on behalf of the organization declarations of its purposes, objects, principles and teachings, must not give his inference as to the meaning of the language heard by him, but must confine his testimony to recounting the substance of the statements, speeches, declarations or conversations, so far as his memory will enable him to recall it. That is to say, a witness to such speeches, declarations or conversations may give the substance of the language as he remembers it, but he may not give his inferences drawn from what was said to him or in his presence. He must not be allowed to place his construction upon the language by stating what he understood it to mean. It is for the jury, not the witness, to determine from the language used at the meetings or in the conversations with the authorized leaders or officers what were the teachings or principles promulgated or what were the objects or purposes had in view by the organization. The general rule is that a witness may not state his impression as to the meaning of the language heard by him or as to the intention of the speaker. (*Braley* v. *Braley,* 16 N. H. 426; *Hibbard* v. *Russell,* 16 N. H. 410 [41 Am. Dec. 733]; *Kingsbury* v. *Moses,* 45 N. H. 222; *Robinson* v. *Robinson,* 159 Cal. 203 [113 Pac. 155].) In the case last cited our supreme court says: "The trial

court did not err in excluding from evidence the conclusions
of the plaintiff as to the meaning defendant intended to con-
vey by said statements to her. She was allowed to state
fully the substance of what he said, and it was for the trial
court to determine the meaning thereof from the words used
and the circumstances under which they were spoken.''
To this general rule an exception is made in actions for
libel or slander, where the libelous or slanderous statement
depends upon the effect which the words produced in the
minds of the readers or hearers. (11 R. C. L., pp. 567–568.)
Also an exception to the rule is permissible where there is
something besides the mere words used which goes into the
making of the inference or conclusion deduced by the hearer,
as, for example, when gestures, tones and innuendoes which
are incapable of description accompany a speech or a conver-
sation and so affect the meaning of the spoken words that a
mere recounting of the words without the accompanying cir-
cumstances will not convey the real meaning of what was
said. (Note to *State* v. *Pruett,* L. R. A. 1918A, pp. 738, 739.)
This last exception to the general rule is but an application
of the well-established doctrine that a witness may state
his conclusion where the facts perceived by the senses are
so complex and subtle as to make it difficult or impossible
adequately to describe them to the jury, and the conclusion
or inference is so simple and so well within the range of
common experience that the witness may relate what he has
observed more accurately, as well as more easily, by stating
his conclusions than by attempting to detail the evidential
facts. But this reason for making an exception to the gen-
eral rule is not applicable here. There is no claim that the
language of any of the statements, speeches, declarations,
oral teachings, conversations or writings heard or read by
any of the witnesses in this case was accompanied by ges-
tures, tones or other conduct which so affected the meaning
of the spoken or written words that a mere recounting of
the substance of the language would not convey the real
meaning of the person who spoke or wrote the words.

Tested by the foregoing it must be held that the trial
court erred in overruling appellants' objections to innumer-
able questions calling for hearsay testimony and for the
witnesses' interpretations of the language which they heard
or read. Thus one of the witnesses for the prosecution, a

police officer who formerly was a member of the I. W. W., after giving what appellants' counsel describes as "a series of exegeses as to the witness' interpretation" of a certain pamphlet, was asked these further questions as to the meaning of the language of the pamphlet and gave the following answers: "Q. Now, Mr. Townsend, as far as you have gone, I will ask you whether or not the explanation you have given as you have gone along was the explanation of the literature that you learned in this school of instruction? A. Yes, in it, and being a member of the I. W. W., *talking to members as individuals, as members.* (Italics ours.) Q. Is there any further passage there? A. Yes. Q. All right, if you will just go ahead and read that and give the explanation of it. A. (Reading) 'It is as a negation of and as a reaction against such methods that the I. W. W. preaches its own form of economic direct action.' That is a statement against craft unionism, that they want to teach that by direct action. Here is the best one of all: 'We want to stir the workers into personal activity and participation in the struggle for a new society.' Now, what is that personal activity that they want to stir the workers into? Direct action, sabotage, the things that I have previously named; to destroy the industries. Personal activity means—Q. I will ask you whether that explanation is what you learned at the schools of instruction? A. Yes. Q. And from conversation with officials *and the rank and file members* of the I. W. W.? (Italics ours.) A. Yes." By these excerpts from the witness' testimony there is shown not only a violation of the rule which forbids the witness giving his conclusions and inferences, but a violation also of the rule against hearsay evidence. A portion of the witness' information may have been gained by him through hearing speeches at recognized meetings of the I. W. W., through secret instruction given him by authorized teachers of the organization's real purposes and aims or through his conversations with officers of the I. W. W.; but he did not pretend to say what portion of his information was so acquired and what portion was obtained by him from private conversations had with members or purported members of the organization—with those whom he referred to as "the rank and file members." As in *State* v. *Cantwell, supra,* the witness was testifying, in part, as to what he had learned

from supposed members of the organization who were not shown to have had authority to speak concerning the organization's purposes and principles. Another witness, who testified that he had joined the I. W. W. for the purpose of getting information for the government, testified as follows: "Q. And from your knowledge *of the organization* (italics ours), I will ask you if you know the attitude of the I. W. W. towards military establishment? A. Yes, sir." Thereupon the defendants, who were not represented by counsel, all of them having elected to conduct their own defense in person, interposed the following objections and motions which met with the following adverse rulings: "Mr. Kohn: May it please the court, we object—he has not been a member since 1919, and anything he can claim to know or think to know can only be hearsay, or conclusions. . . . The Court: . . . Objection overruled. Mr. White: I move that the literature of the I. W. W. be used as the best evidence, and not this man's testimony. The Court: Objection overruled." Thereupon the witness proceeded as follows: "Q. By Mr. Hill (the public prosecutor): The question is, what is their attitude toward the military establishment? A. They support every movement for the reduction of the army and navy; they discourage enlistments in the army and navy, the national guard, and so on, without exception. Q. Why? A. To increase their chances of success when the time comes for a revolution. Mr. White (a defendant): I certainly object to the answer and the question both, and ask that it be stricken out and the jury instructed to disregard them as plainly a conclusion of the witness, why these members of the I. W. W. done this. The Court: Motion denied." In this testimony we have an example of a flagrant violation of the rule which forbids a witness to place his interpretation upon language heard or read by him or to give his inferences as to the meaning of spoken or written words. Another witness, a former mayor of Seattle, was permitted to testify that during his incumbency of the office of mayor of that city he read official copies of certain resolutions published in the Seattle Union Record, a newspaper which he testified was owned by the Central Labor Council. The prosecuting officer, over defendants' objections that it called for the conclusion of the witness, was then permitted to ask the question, "And

by whom was the Central Labor Council controlled at that time?" To which the witness answered: "The Central Labor Council was controlled at that time by members of the Industrial Workers of the World." A more glaring violation of the rule forbidding a witness to state his conclusion could not well be imagined. The record before us, covering almost seven thousand pages, is replete with just such errors, a few of which we have culled at random for the purpose of illustration. That these errors were prejudicial is shown beyond the shadow of a doubt. It was the contention of the defendants at the trial that since the year 1918 the literature issued by the I. W. W. and the teachings of that organization have undergone a radical change, and that ever since that year violence and sabotage no longer have been taught or justified by that group of men. It was important, therefore, that the jury should be apprised of the principles, policies, aims, and purposes of the organization within the three-year period immediately preceding the filing of the indictment, and not be led astray by hearsay evidence and incompetent conclusions based, in part at least, upon speeches, declarations, and conversations occurring prior to the time when, as the defendants claimed, the principles, purposes, and teachings of the organization were greatly modified.

[6] But one further error needs consideration. After having read to the jury the Criminal Syndicalism Act, the trial court gave the following instruction: "You are instructed that the word 'criminal syndicalism' is defined in the law I have read to you and you are to be governed by that definition. It is defined in Webster's New International Dictionary as follows: 'It aims to abolish the present political and social system by means of the general strike, and direct action, which is any kind of action that is directly effective, whether it be a simple strike, *a peaceful public demonstration,* sabotage or revolutionary violence.' " (Italics ours.) This instruction was misleading and tended to confuse the jury. It could hardly have failed to create in the minds of the jurors the erroneous notion that not only is there no conflict between the law's definition and Webster's definition, but that criminal syndicalism is a crime which embraces any and every aim to abolish the present political and social system by any directly effective action,

even though such action amount to no more than a peaceful public demonstration.

It is but fair to say that the attorney-general, in the brief filed by him, virtually concedes that the judgment should be reversed.

The judgment against each appellant and the order denying the motion for a new trial are reversed.

Works, J., and Craig, J., concurred.