Argued October 9; affirmed November 26, 1935; rehearing
denied January 21, 1936

# STATE *v.* DE JONGE

(51 P. (2d) 674)

*Irvin Goodman,* of Portland (Harry L. Gross, Clifford O'Brien, and Dan Hartley, all of Portland, on the brief), for appellant.

*Maurice E. Tarshis* and *George C. Graham,* Deputy District Attorney, both of Portland (James R. Bain, District Attorney, of Portland, on the brief), for the State.

BAILEY, J. The defendant, Dirk De Jonge, was on September 29, 1934, indicted by the grand jury of

Multnomah county, Oregon. The charging part of the indictment is as follows:

"The said Dirk De Jonge, Don Cluster, Edward R. Denny and Earl Stewart on the 27th day of July, A. D. 1934, in the county of Multnomah and state of Oregon, then and there being, did then and there unlawfully and feloniously preside at, conduct and assist in conducting an assemblage of persons, organization, society and group, to-wit: The Communist Party, a more particular description of which said assemblage of persons, organization, society and group is to this grand jury unknown, which said assemblage of persons, organization, society and group did then and there unlawfully and feloniously teach and advocate the doctrine of criminal syndicalism and sabotage, contrary to the statutes in such cases made and provided, and against the peace and dignity of the state of Oregon."

This defendant, who was tried separately at his request, after a trial lasting in excess of three weeks, was found guilty as charged. From judgment entered on the verdict he has appealed.

On Friday, July 27, 1934, there was held at what was referred to as Unity Center, 68 Southwest Alder street, Portland, Oregon, a meeting which had been previously advertised by mimeographed handbills issued by the Portland section of the Communist party. The number of people in attendance was variously estimated by some who were present, at one hundred fifty to three hundred. It was estimated by some of the members of the Communist party present that not to exceed 10 to 15 per cent of those in attendance were members of the Communist party. No admission charge was made and no question was asked of those entering as to whether or not they were members of or in sympathy with the Communist party. The notice of the meeting advertised it as a protest against raids.

At this meeting Edward R. Denny acted as chairman. The defendant gave the following reason for his own attendance: "I went to that meeting because I was instructed by the section committee of the Communist party through its section organizer, comrade Louis Olson, to speak at that meeting in the name of the Communist party." De Jonge, who admitted that he was and for several years had been a member of the Communist party, was the second speaker on the program, and in his talk protested against conditions at the county jail, the action of city police in relation to the maritime strike then in progress in Portland, and numerous other matters. As stated in his own language: "Well, at that meeting, speaking as a Communist, representing the Communist party, I went into a discussion as to why the Workers' Book Shop, the Communist party headquarters, the Marine Workers' Industrial Union hall, the Civic Emergency Federation and International Labor Defense halls were raided. * * * I told the workers there, at least, I laid the background for the reasons why these workers' halls and offices were raided. I told the workers that the reason of these attacks upon the working class organizations was a stepping stone on the part of the steamship companies and stevedoring companies to break the maritime longshoremen's and seamen's strike; that they hoped to break that strike by pitting the maritime longshoremen and seamen against the Communist movement." Much more in addition was stated by defendant concerning what he spoke about in the meeting that evening.

There was also testimony to the effect that Communistic literature was sold at the meeting, among which were "The Young Communist" and "The Daily Worker", and that De Jonge had urged those in the

audience to be present at a street meeting of the Communist party scheduled for the next evening, which "would be in defiance of the local police authority". The defendant also made a plea for new members to join the Communist party. Asked whether or not he had urged those present to buy Communistic papers and literature, the defendant answered: "I don't remember whether I did or not. But I usually do at meetings held by the Communist party; that is, every Communist is a literature salesman as well as an organizer." At the trial a vast amount of official Communistic literature was introduced, most of which was received without objection on the part of defendant. Only a small amount of such literature was found in the hall where the meeting was held.

This meeting was described by most of the witnesses as having been conducted in an orderly manner, except that there was a little stir when the police entered, after the talks had been made and when the meeting was about to be opened for general discussion. A group of those present, however, had formed a "defense circle" to resist any attack by what they referred to as "vigilantes". They had been warned that there might be an attempt by the "vigilantes" to break up the meeting.

The literature introduced into the record refers to the Communist party as the leading force of the proletariat against the bourgeoisie and what is termed "imperialism" and "capitalism". All of it is written in somewhat specialized terminology. There is constant reference in all these writings to "mass movement", "mass activity", "mass organization", "revolutionary action", "revolutionary struggle", "revolutionary proletariat", "proletarian revolution", "mass revolution" and "the revolutionary way out". The

limit of this opinion will permit inclusion of only a few excerpts from the literature introduced in evidence.

From "Programme of the Communist International" we quote:

"The conquest of power by the proletariat is the violent overthrow of bourgeois power, the destruction of the capitalist State apparatus (bourgeois armies, police, bureaucratic hierarchy, the judiciary, parliaments, etc.), and substituting in its place new organs of proletarian power to serve primarily as instruments for the suppression of the exploiters.   *   *   *

"The Soviet State completely disarms the bourgeoisie and concentrates all arms in the hands of the proletariat; it is the armed proletarian State. The armed forces under the Soviet State are organized on a class basis, which corresponds to the general structure of the proletarian dictatorship, and guarantees the rule of leadership to the industrial proletariat.   *   *   *

"This organization, while maintaining revolutionary discipline, insures to the warriors of the Red Army and Navy close and constant contacts with the masses of the toilers, participation in the administration of the country and in the work of building up Socialism."

This same pamphlet after urging to readiness to "lead the working class to the revolutionary struggle for power" and advising mass action "when the revolutionary tides are rising", describes the plan of "attack" as follows:

"This mass action includes: a combination of strikes and demonstrations; a combination of strikes and armed demonstrations and finally, the general strike conjointly with armed insurrection against the State power of the bourgeoisie. The latter form of struggle, which is the supreme form, must be conducted according to the rules of war; it presupposes a plan of campaign, offensive fighting operations and unbounded devotion and heroism on the part of the

proletariat. An absolutely essential condition precedent for this form of action is the organization of the broad masses into militant units, which, by their very form, embrace and set into action the largest possible numbers of toilers (Councils of Workers' Deputies, Soldiers' Councils, etc.), and intensified revolutionary work in the Army and Navy."

On a succeeding page of the same publication is found the following:

*"The Communists disdain to conceal their views and aims. They openly declare that their ends can be attained only by the forcible overthrow of all existing social conditions. Let the ruling classes tremble at the Communist revolution. The proletarians have nothing to lose but their chains. They have a world to gain.*

*"Workers of all countries, unite!"*

This last quoted excerpt appears in various other Communist publications, printed in italics.

From "Theses and Statutes of the Third (Communist) International" we take the following:

"The Communist International makes its aim to put up an armed struggle for the overthrow of the international bourgeoisie and to create an international Soviet republic as a transition stage to the complete abolition of the State. * * *

"The Communist International fully and unreservedly upholds the gains of the great proletarian revolution in Russia, the first victorious Socialist revolution in the World's history, and calls upon all workers to follow the same road. * * *

"The general state of things in the whole of Europe and of America makes necessary for the Communists of the whole world an obligatory formation of illegal Communist organizations along with those existing legally. * * *

"The International League of Communist Youth is subordinate to the Communist International and its executive committee. * * *

"A persistent and systematic propaganda and agitation is necessary in the Army, where Communist groups should be formed in every military organization. Wherever, owing to repressive legislation, agitation becomes impossible, it is necessary to carry on such agitation illegally. But refusal to carry on or participate in such work should be considered equal to treason to the revolutionary cause, and incompatible with affiliation with the Third International.  *   *   *

"The Communist International has declared a decisive war against the entire bourgeoise world and all the yellow Social-Democrat parties.   *   *   *

"The working class can not achieve the victory over the bourgeoisie by means of the general strike alone, and by the policy of folded arms. The proletariat must resort to an armed uprising.   *   *   *

"The Communist party must be founded on the principle of the strictest centralization, and during the period of civil war it must introduce military discipline in its ranks.   *   *   *"

In "The Communist", published by "the Communist party of the U. S. A.", issue of July, 1929, appears the following:

"When Communists urge strikes and crippling of industry in time of war, we are accused of trying to bring about the defeat of 'our own' government. To that charge we plead guilty. That is precisely our aim. A government engaged in warfare is weaker than at other times in spite of the fact that its savage repressions make it appear stronger to the superficial observer. At such a moment an organized drive to stop the production of war supplies, to cripple the transportation system, may result in creating such difficulties that the imperialist forces may be defeated.  *   *   *

"When a revolutionary situation is developing, as a result of war or from any other cause, the party of the proletariat must lead a direct attack against the capitalist State. The slogans put forth must be of such

a nature as to guide the movement in its development, which will take the form at first of mass strikes and armed demonstrations. In that stage there arises the question of arming of the working class and disarming the capitalist class. Finally the highest form of struggle is reached, wherein it culminates in the general strike and a merging of large sections of the military forces and the workers for armed insurrection against the capitalist State power.

"We thus indicate the high lights in the development of the revolutionary struggle against the bourgeoisie in order to emphasize the world-historic importance of the mobilization of the working class for the struggle against imperialist war. Every revolutionary worker, realizing the significance of August 1st, will work day and night to make our strike and demonstrations the greatest concerted action on the part of the working class this country has ever seen."

From "Fundamentals of Communism" we take the following:

"Complete Communism will know no more war. A real, assured people's peace is possible only under Communism. But this goal can not be reached by peaceful, 'pacifist' means; on the contrary, it can be reached only by civil war against the bourgeoisie."

"Manifesto of the Communist Party" contains this:

"The proletariat goes through various stages of development. With its birth begins its struggle with the bourgeoisie. At first the contest is carried on by individual laborers, then by the work people of a factory, then by the operatives of one trade, in one locality, against the individual bourgeois who directly exploits them. They direct their attacks not against the bourgeois conditions of production, but against the instruments of production themselves; they destroy imported wares that compete with their labors, they smash machinery to pieces, they set factories ablaze, they seek to restore by force the vanished status of the workmen of the middle ages."

In the mimeographed circular of December 26, 1933, issued by the Agitation and Propaganda Department of District 12 of the Communist party of the United States, which includes Oregon, appears the following:

"Question 2. The party must teach the masses that it is impossible to maintain the old order and that it is necessary to overthrow it through revolutionary means. Does the party teach this only through agitation and propaganda?

"Answer. 'Agitation and propaganda does not suffice to bring the masses to a suitable frame of mind. They need also to be schooled by political experience . . .

" '. . . *we shall put forward methods of struggle and forms of organization which will* permit the masses to learn from experience the truth and correctness of our revolutionary watchwords.' (Lenin)

"(strikes, demonstrations, revolutionary unions, unemployed councils.)"

The above matter in italics appears in the circular as underlined type.

"Program of the Young Communist International", approved by the Presidium of the Executive Committee of the Communist International, for use by the Young Communist International, a section of the Communist International, contains among other things the following:

"The overthrow of capitalism has thus become the direct fighting aim of the international working class. It can be achieved only by means of violent revolution.
\* \* \*

"The Communists publicly declare that, in order to overthrow the capitalist system and establish the proletarian dictatorship, the armed uprising of the proletariat is necessary. Only by the victory of proletarian arms, by the formation of a Red Army and armed defense of the achievements of the revolution against all attempts of the bourgeoisie, will the proletariat grad-

ually be able to lead mankind toward a classless society in which the use of arms will be a thing forgotten."

In "Why Communism" it is stated:

"We communists say that there is one way to abolish the capitalist State, and that is to smash it by force. To make Communism possible the workers must take hold of the State machinery of capitalism and destroy it."

This pamphlet ends with the following declaration:

"The Communist party of the U. S. A. is thus part of a world-wide organization which gives it guidance and enhances its fighting power. Under the leadership of the Communist party the workers of the U. S. A. will proceed from struggle to struggle, from victory to victory, until, rising in a revolution, they will crush the capitalist State, establish a Soviet State, abolish the cruel and bloody system of capitalism and proceed to the upbuilding of Socialism.

"This is why every worker must join the Communist party."

Instructing members of the Communist party as to conduct required of them in given circumstances, the pamphlet "Why Communism" offers the following directions:

"Freedom must be fought for and this fight can not wait. It is a matter requiring action right now and every day. Your employers try to prevent you from organizing: organize. They will try to fire your organizers: stand pat, defend them! They will try to discharge more: answer by calling a strike: picket the plant! They will send policemen and hired deputies to break up your picket line: stand firm, don't yield! They will send a reformist union leader to persuade you to accept boss arbitration: drive him out like a yellow cur! They will put some of your leaders in jail: demonstrate, protest, fill the court room with hundreds of workers, demand the release of your comrade, picket

the court house, picket the judge's house, call other workers to help you in your struggle; make your struggle the struggle of great numbers of class conscious workers!''

In the organization of the Communist party we find as the smallest group what is referred to as the ''nucleus'' or ''unit'', existing in a shop, factory, mine or street. A ''street nucleus'', so-called, consists of at least three members of the Communist party all of whom do not work in the same shop, factory, mine or mill. The next higher division is the ''section'', which is composed of two or more units in a given territory. Ordinarily the units belong to the section, but sometimes are directly connected with the district organization. Above the section is the ''district'', which is composed of sections and outlying units. Multnomah county, Oregon, is included in the ''twelfth district'' of the Communist party in the United States, which district comprises Oregon, Washington, Alaska and part of Idaho. Above the district is the ''central committee'', formed of representatives at large from the various districts of the American party of Communists. ''Fractions'' are groups of members of the Communist party who work together wherever they find themselves as members of other organizations, committees, parliamentary bodies and workmen's councils. Their obligation is to urge from within the ranks Communistic views and policies upon such non-Communist organizations and bodies.

The Communist party of the United States is affiliated with the Third International, or what is known as the Communist International. All members of the Communist party are under obligation to obey the orders and rulings of the various organizations controlling the unit or section to which they belong.

The appellant contends that the state criminal syndicalism law as applied in the present instance is violative of the Fourteenth amendment of the federal constitution and of Article I, §§ 8 and 26, Oregon constitution. Relying upon the case of *Fiske v. Kansas,* 274 U. S. 380 (71 L. Ed., 1108, 47 S. Ct. 655), it is insisted that the law as applied to the present case is an arbitrary and unreasonable exercise of the police power of the state and unwarrantably infringes the liberty of the defendant.

The criminal syndicalism law, §§ 14-3110, 14-3111 and 14-3112, Oregon Code 1930, as amended by chapter 459, Oregon Laws 1933, reads thus:

"Section 14-3110. Criminal syndicalism hereby is defined to be the doctrine which advocates crime, physical violence, sabotage, or any unlawful acts or methods as a means of accomplishing or effecting industrial or political change or revolution.

"Section 14-3111. Sabotage hereby is defined to be intentional and unlawful damage, injury or destruction of real or personal property.

"Section 14-3112. Any person who, by word of mouth or writing, advocates or teaches the doctrine of criminal syndicalism, or sabotage, or who prints, publishes, edits, issues or knowingly circulates, sells, distributes or publicly displays any books, pamphlets, paper, handbill, poster, document or written or printed matter in any form whatsoever, containing matter advocating criminal syndicalism, or sabotage, or who shall organize or help to organize, or solicit or accept any person to become a member of any society or assemblage of persons which teaches or advocates the doctrine of criminal syndicalism, or sabotage, or any person who shall orally or by writing or by printed matter call together or who shall distribute or circulate written or printed matter calling together or who shall preside at or conduct or assist in conducting any assemblage of persons, or any organization, or any society,

or any group which teaches or advocates the doctrine of criminal syndicalism or sabotage is guilty of a felony and, upon conviction thereof, shall be punished by imprisonment in the state penitentiary for a term of not less than one year nor more than ten years, or by a fine of not more than $1,000, or by both such imprisonment and fine."

The crime with which the defendant is charged is that of unlawfully and feloniously presiding at, conducting and assisting to conduct an assemblage of persons, organization, society and group engaged in unlawfully and feloniously teaching and advocating the doctrine of criminal syndicalism and sabotage. In the case of *Fiske v. Kansas,* supra, under the criminal syndicalism statute of Kansas, which is closely similar to the present Oregon law, the indictment charged that the defendant did "by word of mouth and by publicly displaying and circulating certain books and pamphlets and written and printed matter, advocate, affirmatively suggest and teach the duty, necessity, propriety and expediency of crime, criminal syndicalism and sabotage by . . . knowingly and feloniously persuading, inducing and securing" certain persons "to sign an application for membership in . . . and by issuing to" them "membership cards" in a certain workers' industrial union, "a branch of and component part of the Industrial Workers of the World organization, said defendant then and there knowing that said organization unlawfully teaches, advocates and affirmatively suggest 'that the working class and the employing class have nothing in common, and that there can be no peace so long as hunger and want are found among millions of working people, and the few who make up the employing class have all the good things of life,' and that 'between these two classes

a struggle must go on until the workers of the world organize as a class, take possession of the earth and the machinery of production and abolish the wage system' ''.

In passing upon the matter the court there said:

"No substantial inference can, in our judgment, be drawn from the language of this preamble, that the organization taught, advocated or suggested the duty, necessity, propriety, or expediency of crime, criminal syndicalism, sabotage, or other unlawful acts or methods. There is no suggestion in the preamble that the industrial organization of workers as a class for the purpose of getting possession of the machinery of production and abolishing the wage system, was to be accomplished by any other than lawful methods; nothing advocating the overthrow of the existing industrial or political conditions by force, violence or unlawful means. * * * The result is that the Syndicalism Act has been applied in this case to sustain the conviction of the defendant, without any charge or evidence that the organization in which he secured members advocated any crime, violence or other unlawful acts or methods as a means of effecting industrial or political changes or revolution."

The indictment in the Fiske case, as will readily be seen by perusing the supreme court's decision therein, is materially different from that in the case at bar, in which latter case it is distinctly charged that the organization sponsoring the meeting which defendant conducted or assisted in conducting taught and advocated the doctrine of criminal syndicalism and sabotage. Criminal syndicalism and sabotage are specifically defined by the act, and the crime charged is in the language of the statute.

It is not necessary here to discuss the constitutionality of the Oregon act, questioned by defendant, for that matter was thoroughly covered in the cases of *State v.*

*Laundy,* 103 Or. 443 (204 P. 958, 206 P. 290), and *State v. Boloff,* 138 Or. 568 (4 P. (2d) 326, 7 P. (2d) 775). See, also, in this connection: *Whitney v. California,* 274 U. S. 357 (71 L. Ed. 1095, 47 S. Ct. 641), and *State v. Hennessy,* 114 Wash. 351 (195 P. 211).

Turning now to the grounds for a directed verdict set forth in defendant's motion therefor, we note that he asserts and argues that the indictment charges the assemblage at which he spoke with unlawfully and feloniously teaching and advocating the doctrine of criminal syndicalism and sabotage, and elsewhere in the same motion he contends that the indictment charges the defendant with unlawfully and feloniously teaching and advocating said doctrine at said meeting. The indictment does not, however, charge the defendant, nor the assemblage at which he spoke, with teaching or advocating at said meeting at 68 Southwest Alder street, in the city of Portland, the doctrine of criminal syndicalism or sabotage. What the indictment does charge, in plain and concise language, is that the defendant presided at, conducted and assisted in conducting an assemblage of persons, organization, society and group, to-wit, the Communist party, which said assemblage of persons, organization, society and group was unlawfully teaching and advocating in Multnomah county the doctrine of criminal syndicalism and sabotage.

The evidence shows that at the time of the defendant's arrest there were sections, units and fractions of the Communist party existing in Multnomah county, Oregon; that they were selling, distributing and circulating official Communist literature and were furthering their organization and adding new members to the Communist party in Multnomah county. The evidence distinctly shows, as may be noted in excerpts

from Communist literature above quoted, that the Communist party was at that time, as well as prior thereto, teaching and advocating the doctrine of criminal syndicalism and sabotage. It was not necessary for the state to show that at the particular moment when defendant was speaking to the assemblage at 68 Southwest Alder street the Communist party did any affirmative act other than as above stated. The meeting at which the defendant spoke was held under the auspices and at the direction of the Communist party. The defendant was sent there by one of the section organizers, and spoke at the instance of the organizer. The chairman announced that the meeting was held under the auspices of the Communist party. The mere fact that members of that organization constituted only a small percentage of those in attendance and that the public was freely admitted does not change the character of the meeting. The defendant at least assisted in conducting the meeting which was an assemblage of persons sponsored by and under the auspices of the Communist party. He was a member of that party and, the record would indicate, the principal speaker at the gathering.

■ On rebuttal the state recalled its witness Bacon, and the following testimony was given by him:

"Q. Mr. Bacon, I will ask you to say if at any time while you were a member of the Communist party, between the dates of March and September, 1930, you ever heard any members of the Communist party discussing a major felony? Answer yes or no. A. Yes.

"Q. Where, and when, and who was present, and what was this major felony you heard discussed? A. Just prior to the demonstration of May 1, 1930, there was a discussion took place in the unit headquarters, at 312 Worcester Building, Portland, in the presence of a member of the District Executive Committee of the

Communist party, Reuben Sandstrum, and others, old members of the Communist party, which was in the nature of instructions from this member, directed particularly to myself, which was acceded to and not dissented with, by the other leading members of the party present to the effect that . . . Stalin had taken the money and jewels out of the Czarist banks and had used the money to carry on the revolution; that they had men planted inside these banks, and raided them, and that we—speaking to myself and of himself and others present as Communists—must begin to do that here, and cited one case of a Communist having held up a bank messenger in San Francisco and obtained forty thousand dollars to carry on the party work. There was no dissent with the suggestion and advocation that such activities be carried on by the party here.''

This witness further testified:

''At another time, sometime in July, 1930, there was occasion for the party to send a delegate to represent the lumber workers to the Soviet Union on a trip, and it was required of the Portland unit that they furnish funds for this trip, and a letter was received and read to the unit—to the members, by Reuben Sandstrum, by Jack Laury, who was at that time district organizer of the Trade Unity League section of the Red International of Trade Unions, under whose auspices this trip was being promoted, asking that they raise a sum of $275.00, I believe—I am not certain as to the exact amount, but it was two hundred some dollars, I believe it was $275.00, and suggested that this money be raised from some of the comrades, which they all termed themselves, and if unable to obtain it as a loan—this was written in pencil as a postscript at the bottom of the letter—I saw the letter myself and read it: 'I suggest that you go out and hold up a bank.' ''

The defendant was not present at the time these conversations were had, and his counsel objected to the testimony on the ground that it was hearsay; that the question was leading; and that the time and place were

not fixed and were too remote. Counsel further objected on the ground that:

"The question calls not only for a conclusion or opinion concerning certain doctrines or alleged doctrines, but it also calls for a conclusion or opinion of law. In other words, this witness will be testifying in two capacities, both as an expert on the law and as an expert on doctrine. And the third thing is this, your honor, this witness was on the stand for a day and a half and we attempted to interrogate him on the very matters, or some of the very matters which the state now is attempting to introduce in rebuttal, and the state objected very strenuously to any examination of this witness or his qualifications. We attempted to examine him on what he was, or when he was a member of the Communist party, how he understood what he was taught, whether he knew anything about it, and so forth, and at this time the state strenuously objected and was sustained by the court in that examination."

It was contended by the state at the time the objections were made by defendant that the sole purpose of the question was to impeach the testimony of Louis Olson, who had been called as a witness by the defendant and had admitted that he was a member of the Communist party and its section organizer for the Portland section. Mr. Olson had testified that the Communist party did not advocate or countenance the use of violence or force in carrying out the purposes of the party.

At the time of the conversations to which Mr. Bacon testified, he was avowedly a member of the Communist party and uncontradicted testimony shows that Reuben Sandstrum was at that time a member of the district executive committee of that party. In the case of *State v. Kowalchuk,* 116 Wash. 592 (200 P. 333), wherein the defendant was convicted of violating the

sabotage act of that state, the court with reference to objections to certain testimony as hearsay pointed out that the objection was not well taken, and further stated:

"The witness testifying was formerly a member of the organization. Manifestly he could testify as to these doctrines and teachings in so far as they were within his own knowledge, and could testify, without violating the hearsay rule, what the organizers, leaders and officers taught him were the doctrines and teachings of the organization. This is to testify to the fact directly, not what some third person stated to him was the fact."

As already noted, the purpose assigned by the state in introducing the testimony objected to was to contradict the testimony of the defendant's witness, Louis Olson. A great deal of time was taken by counsel for defendant in having Mr. Olson give expert testimony as to the meaning of many statements appearing in numerous official Communist pamphlets and writings introduced in evidence. Many of these pamphlets had been published and were in use long before the meetings and conversations to which Mr. Bacon referred in his testimony. After giving this expert testimony, Mr. Olson stated, as previously noted, that the Communist party did not teach or advocate violence to attain its ends. In other words, it was the contention of the defendant that the Communist party had not for some time, and did not then, either in its literature or in practice, teach or advocate the doctrine of criminal syndicalism or sabotage. The testimony of Mr. Bacon was not only contradictory of what the witness Olson said but was also cumulative as to much of the documentary evidence which had been introduced into the record without objection. In testifying, Bacon stated definitely the time and place of the conversations.

Therefore, his answer met any objection which defendant may have had to the question on that ground.

The objection that Bacon's testimony was hearsay was not amplified in any manner by pointing out in what respect it was deemed hearsay, nor was any objection made that what was said was not sufficiently connected with the Communist party's teachings. Before this testimony was presented the defendant had introduced evidence as to the organization of the Communist party and indicative of the duty of each member of the party to obey the orders and instructions of those higher in authority. According to the evidence, Reuben Sandstrum, because of his position, had authority to speak on behalf of the party. The meeting was in the unit headquarters of the Communist party and attended by Communists. For further justification of the admission of this testimony as not within the hearsay rule, and as competent evidence of the teachings of the Communist party, in addition to *State v. Kowalchuk,* supra, see: *State v. Pettilla,* 116 Wash. 589 (200 P. 332); *Burns v. United States,* 274 U. S. 328 (71 L. Ed. 1077, 47 S. Ct. 650); and *State v. Boloff,* supra.

As one of the grounds for asking a directed verdict, defendant set forth the alleged misconduct of the special prosecuting attorney during the trial of the case, referring to his examination of jurors, his testimony as a witness in the case, his conduct during the trial and his alleged statements made during argument to the jury. There is no one particular incident on which the assignment of error based on the refusal to direct a verdict is predicated. But it is contended that the general conduct of this prosecutor was abusive and prejudicial to defendant, his attorneys and the prospective jurors.

The only matter referred to by defendant in his brief concerning the argument to the jury is as follows: "A final example should suffice: the special prosecutor's concluding argument to the jury (Tr., pp. 1036-1048, inclusive). We shall not relate the argument here. We do state that as an evasion of the issues of the case, particularly as an appeal to prejudice, to patriotism, to hatred, it is probably unique."

No objection to any definite part of the argument by special counsel is referred to in appellant's brief, nor was there any direct reference made thereto in the oral argument before us. The record discloses that in addition to arguments made by two of defendant's counsel, he himself addressed the jury, although not any of these arguments were reported. Only once during the argument of the special prosecutor did the defendant object, and that was when the special prosecutor had gone outside the record and referred to intimidation presumably practiced by the Communist party, and said that during the past twelve hours "I have had my home bothered, I have had my wife bothered," which counsel for defendant interrupted by saying: "If your honor please, are we going to be required to meet vague and fantastic tales that may be brought into the case at this time? This is something out of the record. *We have allowed counsel a lot of lee-way.*" [Italics supplied.]

No motion was made by defendant during the closing argument of special counsel, which was the only one made by that prosecutor, or at the conclusion thereof, for a mistrial, nor was any request made to the court during the argument or at its close to have the jury disregard any statement made by him, except as hereinbefore pointed out.

The defendant was ably represented by four attorneys at the trial, and since none of them objected to any part of the argument of the special prosecutor except as herein noted and they do not now base their claim for reversal on any particular act or acts of that prosecutor, we do not deem it necessary to pick out part of a sentence from what was said by him in his closing argument, to which specific utterance no objection was made, and thereon base a reversal of the judgment. We believe, from the entire record, that the acts of the prosecutor referred to by the appellant as grounds for mistrial were not such an abuse of discretion by the trial court as would warrant a reversal of the judgment from which this appeal was taken.

■ During the trial of the case there was introduced a carbon copy of a letter signed by H. H. Smith, superintendent of an express company by which defendant's witness Mackrill had been employed. The letter, dated at Seattle April 14, 1930, and addressed to said Mackrill, was as follows: "As a result of your investigation held in my office on April 12th, and in accordance with Rule No. 29 of the agreement, I am obliged to advise you of your dismissal from the service of the company effective from last date of your employment." This letter was introduced while Mr. Wolf was on the stand, who testified that he had custody and possession of the records, that this was a true copy of the letter which had been written to Mr. Mackrill and that in the ordinary course of business of the company the original letter would have been sent by mail to Mr. Mackrill. He further testified that the signature on the carbon copy so introduced was that of Mr. Smith. Defendant's counsel objected to the introduction of the letter on the ground that there was no proof that the original could

not be produced, and, further, that there was no proof that Mr. Mackrill ever received such a letter.

Mr. Mackrill had already testified that he had not received from the express company any such letter. It would therefore be impossible to produce the original sent to him, and secondary evidence of its contents was admissible. The proper foundation for the introduction of this exhibit was laid by showing that in the ordinary course of business the original would have been sent by mail. The object which the state had in introducing this exhibit was to discredit some of Mackrill's testimony, and no prejudicial error was committed by the court in this connection.

■■ During the cross-examination by defendant's counsel of one of the witnesses for the state the court denied to counsel the right to read at that time from certain exhibits which had been introduced in evidence by the state. The reason given by the court was that, if read by counsel for defendant, such reading should be done in the presentation of his defense. Later, extensive readings from these exhibits were made by defendant's counsel, and no limit was placed on what might be read. It is within the province of the trial court to direct the order of proceedings, and we believe that there was no abuse of discretion in this matter.

■ At one time during the trial the court thus addressed the jury: "You will recall that from time to time I have cautioned you about your duty during separation. In this connection, the court wishes to ask you a general question, the whole jury and the alternate juror: Did any member of the jury hear a radio address on the Portland station K A L E last evening, Sunday, November 4, 1934, between the hours of eight-thirty and eight-forty-five p. m., made by one of the counsel for defense, wherein reference was made to this case? Did

any of you happen to hear it?" To this the jurors answered, "No". Defendant's counsel immediately moved for a mistrial on the ground of misconduct on the part of the court, contending that there was nothing before the court on which any question to the jury could be predicated. Without extended discussion, it is sufficient to say that we see no merit in this objection. The court was striving to see that a fair trial was had, both on behalf of the state and of the defendant, and certainly from the record it is not apparent that the defendant could have been prejudiced in any way by the question.

Numerous other assignments of error are set out in appellant's brief. Those which we have not specifically discussed are so closely connected with or related to the assignments which we have passed upon that nothing further need be said in regard to them. Some of the assignments are not separately and specifically discussed by the appellant. We have not attempted here to undertake minute treatment of each and every assignment of error under the respective heading presented. We have given all the evidence in the case and the argument on behalf of appellant careful consideration and we are convinced that no prejudicial error was committed by the trial court, and that the defendant has had a fair and impartial trial.

Almost a month was consumed by the circuit court in the trial of this case. Numerous witnesses were heard and many exhibits introduced. The defendant frankly admits that he is, and for some time prior to the date of the meeting at 68 Southwest Alder street, called and held under the auspices of the Communist party, had been, a member of that party; that he attended that meeting and there spoke in the interest of that party under instructions of the section organizer

of the Communist party; that he was one of the principal speakers, if not the principal one, at that assemblage; and that every member of the party is a literature salesman and an organizer for the party. He did not deny that at the meeting referred to he urged those present to buy Communist literature and to join the Communist party. His time is almost entirely devoted to promoting the interests of that organization.

Excerpts from official Communist literature have hereinbefore been set out, and it is unnecessary to discuss further their contents. That such literature teaches and advocates the doctrine of criminal syndicalism and sabotage can not be denied.

It is practically impossible to conduct a trial between conflicting forces for several weeks wherein rulings of the court and conduct of counsel are entirely free from any adverse criticism. Were we to reverse every case in which infractions of the rules as to the introduction of evidence occurred, there would never be an end to litigation. Before a judgment will, or should, be reversed there must be shown some error of the trial court prejudicial to the rights of the complaining party. As already stated, no such error was committed in the case here in review. The verdict was in accordance with the great weight of the evidence. If we were to resort to the salutary mandate of Article VII, § 3 of our constitution, it should be for the purpose of affirming the judgment.

The legislature has prescribed as a penalty for violation of the criminal syndicalism law imprisonment for one to ten years or a fine of not exceeding $1,000, or both such imprisonment and fine. The trial judge is charged with the duty of imposing the sentence and is in a much better position to perform that duty than

is an appellate court, due to the fact that he has seen and heard all the witnesses, including the defendant. If the sentence pronounced in this instance be considered too severe, the defendant has his remedy by petition to the chief executive of the state, who has power to reduce the sentence. In considering such a petition many facts may be reviewed which are not contained in the record before this court.

The judgment appealed from is affirmed.

CAMPBELL, C. J., and KELLY and ROSSMAN, JJ., concur.

———

BEAN, J. (concurring in part). It is my opinion that under Art. VII, section 3 of the Constitution of Oregon, notwithstanding any errors, or alleged errors, committed during the trial of this case, the judgment and sentence of seven years in the penitentiary should be reversed, and that the cause should be remanded to the circuit court with instructions to sentence the defendant to a term of not exceeding two years in the penitentiary of Oregon.

The testimony in the case, I believe, is sufficient to warrant the finding of the defendant guilty of the crime charged.

———

BELT, J. (dissenting). Dirk De Jonge was convicted of having violated the criminal syndicalism act of this state and sentenced to serve a term of seven years in the penitentiary, notwithstanding the recommendation of the jury for leniency. It is, indeed, a terrible price to pay for warped ideas. With all deference to the conscientious trial judge who imposed such sentence, and for whom I have a high regard, it

seems to me that the sentence has no reasonable relation to the offense alleged to have been committed. No act of violence was involved in the case. De Jonge has never before been convicted of crime. However, it is only fair to say that for many years he has been identified with radical organizations and is generally looked upon as an agitator.

In my opinion, this court, in the interests of justice, should, under and by virtue of Art. VII, § 3 of the Oregon Constitution, materially reduce the penalty. Such is the practice in Oklahoma, by virtue of its Code of Criminal Procedure (§ 3204 Okl. Stats., 1931), when the appellate court concludes that an excessive penalty has been imposed: *Welch v. State,* 20 Okl. Cr. 190 (201 P. 524); *Fritz v. State,* 8 Okl. Cr. 342 (128 P. 170). That this court has the power, under the above Constitutional provision, to modify the judgment and sentence of the lower court, in a criminal action, seems to me to be clear. The people, in adopting this Constitutional provision, however, were careful to provide that the supreme court in a criminal action was not authorized to find the defendant guilty of an offense for which a greater penalty was provided than that of which the accused was convicted in the lower court. I concede that this power should be exercised by the appellate court only in extreme cases, but, in my opinion, it would be proper to do so here.

The assignment of error upon which this dissent is principally based pertains to the ruling of the trial court permitting the witness Bacon, who was called by the State, to answer on rebuttal, over the objection of the defendant, the following question:

"Q. Mr. Bacon, I will ask you to say if at any time while you were a member of the Communist Party, between the dates of March and September of 1930, you

ever heard any members of the Communist Party discussing a major felony? * * *."

When objection was interposed, Mr. Doyle appearing as special prosecutor at first stated that "This question is made for the sole purpose of impeaching the testimony of Louis Olson", but later contended that such testimony was admitted "as to whether the Communist Party advocates criminal syndicalism, bank robberies and felonies", and that "it is for the purpose of impeaching that testimony alone". On appeal the theory of impeachment of the witness Olson was apparently abandoned and the state now urges that this testimony was admissible to show that the Communist party taught and advocated criminal syndicalism.

In response to the question, the witness Bacon thus answered:

"A. Just prior to the demonstration of May 1st, 1930 *there was a discussion* took place in the unit headquarters, at 312 Worcester Building, Portland, in the presence of a member of the district executive committee of the Communist Party, Reuben Sandstrum and others, old members of the Communist Party, which was in the nature of instruction *from this member*, directed particularly to myself, which was acceded to and not dissented with, by the other leading members of the Party present, to the effect that — —

\* \* \* \* \*

"Mr. Goodman: Was the defendant, Dirk DeJonge, present? A. No.

\* \* \* \* \*

"A. (continuing) to the effect that Stalin had taken the money and jewels out of the Czarist banks and had used the money to carry on the revolution; that they had had men planted inside these banks, and raided them, and that we,—speaking to myself and of himself

and others present as Communists,—must begin to do that here, and cited one case of a Communist having held up a bank messenger in San Francisco and obtained forty thousand dollars to carry on the Party work. There was no dissent with that suggestion and advocation that such activities be carried on by the Party here.

"At another time, some time in July, 1930, there was occasion for the Party to send a delegate to represent the lumber workers of the Soviet Union on a trip, and it was required of the Portland unit that they furnish funds for this trip, and a letter was received and read to the unit,—to the members, by Reuben Sandstrum, by Jack Laury, who was at that time district organizer of the Trade Unity League section of the Red International of Trade Unions, under whose auspices this trip was being promoted, asking that they raise a sum of $275.00, I believe,—I am not certain as to the exact amount, but it was two hunderd some dollars, I believe it was $275.00, and suggested that this money be raised from some of the comrades, which they all termed themselves, and if unable to obtain it as a loan,—this was written in pencil as a postscript at the bottom of the letter,—I saw the letter myself and read it: 'I suggest that you go out and hold up a bank.' *Those are two specific instances* that I remember very clearly. Also on May 1st, 1930, they gave out the program of the march — —." (Italics ours.)

In my opinion, this evidence was clearly inadmissible. Diligent search of the authorities reveals none going so far as to hold that a witness can relate a conversation had, in the absence of the defendant, with some member of the Communist party who purports to state what such party teaches and advocates, unless it be shown that such person was authorized to so speak. Especially do courts reject the evidence of the commission of particular crimes by some member of an organization, as tending to show what the organization taught and advocated.

In the instant case the alleged conversation or discussion occurred approximately four years prior to the meeting in question. The defendant is deprived of the opportunity to cross examine the person alleged to have made such statements, relative to his knowledge or conception of the organization about which he speaks. As stated in *People v. Ware,* 67 Cal App. 81 (226 P. 956):

"The testimony of a witness as to talks which he had with persons whom he believed to be members of the organization, whether such belief be founded upon membership cards shown to the witness or upon declarations made to him by such supposed members, and in which talks the persons whom the witness so believed to be members made statements of what purported to be the purposes, objects, principles, or teachings of the organization, is hearsay testimony, and as such is inadmissible." Citing, in support thereof, *State v. Gibson,* 115 Wash. 512 (197 P. 611); *State v. Cantwell,* 119 Wash. 665 (206 P. 362)—the latest expression of the Washington Supreme Court.

Also to the same effect, see *State v. Pettilla,* 116 Wash. 589 (200 P. 332); *People v. Wagner,* 65 Cal. App. 704 (225 P. 464); *People v. Bailey,* 66 Cal. App. 1 (225 P. 752); *State v. Dingman,* 37 Idaho 253 (219 P. 760).

*State v. Boloff,* 138 Or. 568 (4 P. (2d) 326, 7 P. (2d) 775), is not to the contrary. In that case the witness was permitted, without objection, to repeat a portion of a speech made by an authorized speaker of the Communist party. As stated therein, the speaker Leavitt "was an agent of the society, acting within the scope of his authority when he spoke". The distinction to which attention has been directed was clearly recognized by Mr. Justice ROSSMAN, speaking for a majority of the court, as is evidenced by his comment upon the holding in *State v. Dingman,* supra. It will be recalled

that, in the instant case, the question to which objection was made sought to have Bacon testify about a conversation relative to the commission of major felony which was had "at any time" by "any members of the Communist Party".

We think the court also erred in receiving, over the objection of the defendant, a carbon copy of the letter addressed to Nolan A. Mackrill, a witness for the defendant. This letter purported to give the reason for dismissal from the Railway Express of Mackrill who was called on behalf of the defense to state what occurred at the meeting of the Communist party. On cross-examination he was questioned at length concerning his services with the Railway Express and the reason for his dismissal. In answer to a question, he stated in substance that he had never received a letter from the company giving the reason for his discharge. The State, to impeach this witness upon what it seems to me was a wholly collateral matter which had nothing whatever to do with the charge in the indictment, introduced in evidence a carbon copy of a letter purporting to have been written to Mackrill. There was no showing that the original letter had been mailed to Mackrill or received by him, nor did the State make any showing for the admission of secondary proof. The error was accentuated by the following argument made by Mr. Doyle of counsel for the State:

"And when you stop to think of this man Mackrill, who brought on to the job, mind you,—and he was the express messenger, don't forget this, and he had four special agents, and somebody gave him some liquor, and he gave the liquor to those four men who were shotgun guards in charge of a million dollars of Government gold. But he didn't drink any, himself.

"And then he lied point blank, cold perjury, anything you want to call it, when I asked him the question

directly as to Rule G. He wouldn't come clean; he hasn't, and won't."

It may be that this assignment of error in itself would not be sufficient to justify a reversal, but it is nevertheless a matter for consideration in determining whether the defendant had the kind of trial which the law contemplates.

Appellant also complains about the alleged misconduct of counsel for the State in his final argument to the jury. In addition to the above, the following portion of the argument is noted:

"I will tell you the type of man this DeJonge is. And I will tell you further than that, each and every one of this jury, if these were war times, there wouldn't be a trial here at all; I wouldn't be able to hold down the sentiment that has accumulated as a result of this man's dangerous activities."

Such argument was highly improper and prejudicial to the rights of the defendant. It was an appeal to passion and prejudice. Any reference to what a mob might do in dealing with the defendant, under any circumstances, is beyond the pale of legitimate argument—even making due allowance for the zeal of counsel.

For the reasons above stated, I dissent from the judgment of conviction.

RAND, J., concurs in this dissenting opinion.